FILED

2020 Apr-24  AM 09:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| KATHERINE GRIFFIN, JANET OAKLEY, and ADAM WHITLEY individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>v.<br><br>SUBARU OF AMERICA, INC., SUBARU CORPORATION, DENSO CORPORATION, and DENSO INTERNATIONAL AMERICA, INC.,<br><br>       Defendants. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Katherine Griffin, Janet Oakley, and Adam Whitley ("Plaintiffs") brings this class action on behalf of themselves and all others similarly situated against defendants Subaru of America, Inc., Subaru Corporation (collectively "Subaru"), Denso Corporation, and Denso International America, Inc. (collectively "Denso").[1]  Based on personal knowledge as to matters relating to their own actions, and on information and belief based on the investigation of counsel, including counsel's review of consumer complaints available on the database of the National

---

[1] Subaru and Denso are collectively referenced as "Defendants."

Highway Transportation Safety Administration ("NHTSA") and other publicly available information, as to all other matters, Plaintiffs alleges as follows:

## **INTRODUCTION**

1.      On April 16, 2020, Subaru submitted a Part 573 safety recall report (the "Recall Report")[2] to NHTSA voluntarily recalling nearly 200,000 Subaru Vehicles[3] manufactured between June 2018 and February 2019 with defective low-pressure Denso fuel Pumps (the "Recall").   In the Recall Report, Subaru identified a dangerous defect in the low-pressure fuel pump which can fail and cause the Recalled Vehicles to unexpectedly stall and cause engine shut down:

> The affected vehicles may be equipped with a low pressure fuel pump produced during a specific timeframe that may include an impeller which has been manufactured with a lower density. If the surface of the lower density impeller is exposed to solvent drying for longer periods of time, it may develop fine cracks. These cracks may lead to excessive fuel absorption, resulting in impeller deformation. Over time, the impeller may become deformed enough to interfere with the body of the fuel pump, potentially causing the low pressure fuel pump to become inoperative.

("Fuel Pump Defect").   Approximately 200,000 Recalled Vehicles are covered the by the Recall, but same dangerous condition is present in all 2013-2019 Subaru

---

[2] The Recall Report is attached hereto as Exhibit A.
[3] Model year 2019 Subaru Ascent, Impreza, Legacy, and Outback vehicles (the "Recalled Vehicles").

manufactured vehicles equipped with Denso made low-pressure fuel pumps with a part number prefix 42022 ("Class Vehicles") which gave rise to the Recall.

2.    Subaru concluded that the Fuel Pump Defect in the Class Vehicles presents an immediate and unreasonable risk of physical injury or death when used in their intended, foreseeable, and ordinary purpose.

3.    The Fuel Pump Defect in the Class Vehicles exposes occupants and others to extreme danger, or even death.  A vehicle that stalls or suffers engine shutdown is at heightened risk for collision.  A vehicle that stalls or suffers engine shutdown causes drivers to react to remove themselves from danger, typically by exiting the road. Drivers stranded on the side of the road experience a heightened risk of danger, whether it is from other vehicles or weather elements.

4.    Fuel pump failure can prevent the driver from accelerating at the necessary and anticipated pace.  Diminished acceleration ability creates unexpected hazards, startling drivers of the Class Vehicles and other drivers in their proximity. Finally, once a Class Vehicle fuel pump fails, the vehicle becomes totally inoperable and will not start.

5.    Defendants collectively designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the subject fuel pump, including the defective impeller identified in the Recall.

6.    While Subaru knew about the Fuel Pump Defect and the associated dangers, Subaru manufactured, marketed, sold, leased, and warranted Class Vehicles, and, in its quest for corporate profits, did not disclose to the unsuspecting public that Class Vehicles were inherently defective, dangerous and create a grave risk for bodily harm or death.  Subaru did not disclose, and to this day has not fully disclosed, what it knew about the Fuel Pump Defect to prospective purchasers and lessees, and existing owners.

7.    In the Recall Report, Subaru stated it will notify consumers on June 5, 2020 and intends to "replace the low pressure fuel pump . . . with an improved part . . .".[4]  However, Subaru did not state when the "improved" fuel pump assembly—if it is in fact improved and poses no danger to consumers—will be available and installed in the Recalled Vehicles.  Moreover, Class members not included in the Recall will not benefit from the remedy Subaru identified.  Egregiously, Subaru failed to timely notify Class members of the Fuel Pump Defect or advise them to cease driving their Class Vehicle. As things currently stand, due to Subaru's failure to timely notify Class members, owners and lessees of the Class Vehicles are unknowingly driving on roads and highways in potentially ticking time bombs while Subaru knowingly exposes its customers, from whom it made millions of dollars

_____

[4] Exhibit A.

from the sale of just the Recalled Vehicles, to the risk of grave physical harm or even death.

8.    Compounding its wrongdoing, despite admitting in the Recall Report that the Fuel Pump Defect increases the likelihood of accidents, egregiously, Subaru has not recommended or advised that consumers stop driving the Class Vehicles until the Fuel Pump Defect can be repaired or replaced.  Given the inherent dangers of driving Class Vehicles, Subaru at a minimum should have contacted purchasers and lessees and offered them free loaner vehicles of comparable make, model, or value of the Class Vehicle they drive until it could devise and implement a fix or take other action to protect consumers' safety.

9.    Moreover, with or without a viable remedy for the Fuel Pump Defect, the Recall has decreased the intrinsic and resale value of the Class Vehicles. Plaintiffs and other Class members have been damaged as a result.

10.    Throughout the relevant period, Subaru's marketing of the Class Vehicles was and is replete with assurances about their safety and dependability.  A vehicle that can suddenly stall and lose power during normal operating conditions is inherently unsafe and renders Subaru's marketing of the Class Vehicles untrue and materially misleading.  Plaintiffs and other Class members have been damaged as a result.

11.    Denso is also culpable because Denso and Subaru together designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the defective fuel pump.

12.    Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated who own or lease a Class Vehicle equipped with the defective fuel pump.

## JURISDICTION AND VENUE

13.    Subject matter jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(a) and (d), because Plaintiffs and Class members are citizens of a state different than Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

14.    Subject matter jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331 because Plaintiffs' Magnuson-Moss Warranty Act claim arises under federal law, and this Court has supplemental subject matter jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

15.    This Court has personal jurisdiction over Subaru because conducts substantial business in this District and some of the actions giving rise to this action took place in this District and/or caused injury to property in this state; and products, materials, or things processed, serviced, or manufactured by Subaru anywhere were used or consumed in this state in the ordinary course of commerce, trade, or use.

Subaru is one of the largest manufacturers and sellers of automotive vehicles in the world. Subaru has, at all relevant times, conducted and continue to conduct business in Alabama, and every other state in the country.

16.    This Court has personal jurisdiction over Denso because Denso routinely conducts business in this District and some of the actions giving rise to this action took place in this District and/or caused injury to property in this state; and products, materials, or things processed, serviced, or manufactured by Denso anywhere were used or consumed in this state in the ordinary course of commerce, trade, or use. Vehicles all over the world, including this District, are equipped with Denso parts, including the Fuel Pump. Denso has, at all relevant times, conducted and continues to conduct business in Alabama, and every other state in the country.

17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district, and a substantial part of the property that is the subject of the action is situated in this district.

## **THE PARTIES**

**Plaintiffs**

### **A. Plaintiff Griffin**

18.    Plaintiff Katherine Griffin is a citizen of Alabama and resides in Birmingham, Alabama.

19.    Plaintiff Griffin purchased a new 2018 Subaru Outback from Montgomery Subaru in Montgomery, Alabama in February 2018. Plaintiff Griffin's Outback is a Class Vehicle.

20.    Through her exposure and interactions with Subaru, she was familiar with Subaru's uniform and pervasive marketing message of safety and dependability, which was a significant reason she purchased her vehicle. Despite touting the safety and dependability of the Class Vehicles, at no point did Subaru disclose to her the Fuel Pump Defect.

21.    Plaintiff Griffin's Class Vehicle exhibits the Fuel Pump Defect. Specifically, when merging onto highways under normal and intended circumstances, Plaintiff Griffin will experience poor throttle response and weak acceleration when depressing the accelerator pedal.

22.    Since Plaintiff Griffin's Class Vehicle is not a Recalled Vehicle, she will not benefit from any corrective remedy Subaru may devise.

23.    Plaintiff Griffin did not receive the benefit of her bargain. She purchased a vehicle of lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Fuel Pump Defect has significantly diminished the value of Plaintiff Griffin's Class Vehicle.

24.    Had Subaru disclosed the Fuel Pump Defect, Plaintiff Griffin would not have purchaser her Class Vehicle, or certainly would have paid less to do so.

**B. Plaintiff Oakley**

25.    Plaintiff Janet Oakley is a citizen of Alabama and resides in Wetumpka, Alabama.

26.    Plaintiff Oakley purchased a new 2017 Subaru Outback from Montgomery Subaru in Montgomery, Alabama in September of 2017. Plaintiff Oakley's Outback is a Class Vehicle.

27.    Through her exposure and interactions with Subaru, she was familiar with Subaru's uniform and pervasive marketing message of safety and dependability, which was a significant reason she purchased her vehicle. Despite touting the safety and dependability of the Class Vehicles, at no point did Subaru disclose to her the Fuel Pump Defect.

28.    Plaintiff Oakley's Class Vehicle exhibits the Fuel Pump Defect. Specifically, when operating her vehicle under normal and intended circumstances, Plaintiff Oakley experiences poor throttle response and weak acceleration when depressing her accelerator pedal. Plaintiff Oakley experiences the Fuel Pump Defect on a weekly basis.

29.    Since Plaintiff Oakley's Class Vehicle is not a Recalled Vehicle, she will not benefit from any corrective remedy Subaru may devise.

30.     Plaintiff Oakley did not receive the benefit of her bargain.  She purchased a vehicle of lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  The Fuel Pump Defect has significantly diminished the value of Plaintiff Griffin's Class Vehicle.

31.     Had Subaru disclosed the Fuel Pump Defect, Plaintiff Oakley would not have purchaser her Class Vehicle, or certainly would have paid less to do so.

## C. Plaintiff Whitley

32.     Plaintiff Adam Whitley is a citizen of Alabama and resides in Montgomery, Alabama.

33.     Plaintiff Whitley purchased a new 2017 Subaru Outback Limited in February 2017 from Montgomery Subaru in Montgomery, Alabama.  Plaintiff Whitley's Outback is a Class Vehicle.

34.     Through his exposure and interactions with Subaru, he was familiar with Subaru's uniform and pervasive marketing message of safety and dependability, which was a significant reason he purchased his vehicle.  Despite touting the safety and dependability of the Class Vehicles, at no point did Subaru disclose to him the Fuel Pump Defect.

35.     Plaintiff Whitley's Class Vehicle exhibits the Fuel Pump Defect. Specifically, when operating his vehicle under normal and intended circumstances,

Plaintiff Whitley experiences poor throttle response and weak acceleration when depressing the accelerator pedal.

36.     Since Plaintiff Whitley's Class Vehicle is not a Recalled Vehicle, he will not benefit from any corrective remedy Subaru may devise.

37.     Plaintiff Whitley did not receive the benefit of his bargain.   He purchased a vehicle of lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation.   The Fuel Pump Defect has significantly diminished the value of Plaintiff Whitley's Class Vehicle.

38.     Had Subaru disclosed the Fuel Pump Defect, Plaintiff Whitley would not have purchaser his Class Vehicle, or certainly would have paid less to do so.

**Defendants**

**A. Subaru Corporation**

39.     Defendant Subaru Corporation ("SC") is a Japanese corporation with its principal place of business in Shibuya-ku, Tokyo, Japan, and the parent company of Subaru of America.

40.     SC, through its various entities (including Subaru of America), designs, manufactures, markets, distributes and sells Subaru automobiles in the United States, including Alabama.

**B. Subaru of America, Inc.**

41.    Defendant Subaru of America, Inc. ("SA"), is a New Jersey corporation with its principal place of business in Camden, New Jersey.

42.    SA is the U.S. sales and marketing subsidiary of, and wholly owned by, SC responsible for distributing, marketing, selling, and servicing Subaru vehicles in the United States, including Alabama.

43.    SA, through its various entities, designs, manufactures, markets, distributes and sells Subaru automobiles through its more than 600 dealerships in the United States, including Alabama.

**C. Denso Corporation**

44.    Defendant Denso Corporation ("DC") is a Japanese corporation located at 1-1, Showa-cho, Karlya, Alchi 448-9661, Japan.  DC is the parent company of Denso International America, Inc.

45.    DC, through its various entities, designed, engineered, tested, and validated the Fuel Pump that is equipped in Subaru vehicles sold/leased in the United States, including Alabama.

**D. Denso International America, Inc.**

46.    Denso International America, Inc. ("DIAM") is incorporated in Delaware and has its principal place of business at 2477 Denso Drive Southfield, Michigan 48033.

47.     DIAM is "Denso's North American regional headquarters and parent company for its North American operations, including design and production engineering, technical support, sales and finance."

48.     DIAM, through its various entities and on behalf of DC, designed, engineered, tested, and validated the Fuel Pump that is equipped in Subaru Vehicles across the Unites States, including Alabama.

## FACTUAL ALLEGATIONS

49.     Subaru manufactures, markets, and sells vehicles all over the United States, including Alabama.

50.     Subaru has branded itself as the maker of safe and dependable vehicles and has spent millions of dollars on extensive marketing and advertising campaigns to cement the association of safety and reliability with Subaru, including the Class Vehicles.  Through its investment marketing, Subaru sought to paint itself as the safest vehicle brand on the market.

51.     Denso is the world's second largest Tier1 Original Equipment Manufacturer ("OEM"), producing parts and products for Subaru and other manufacturers.  According to its website, Denso recorded nearly $50 billion in consolidated net sales in 2019.

52.    Denso, with Subaru's assistance, designed, engineered, tested, manufactured, and placed in the stream of commerce the defective Fuel Pump at issue in this litigation.

53.    According to Denso itself, when designing, engineering, testing, and manufacturing its products, Denso aims to "[c]ontribute to future mobility that is safer, more comfortable and convenient for everyone."   The Fuel Pump fails to meet Denso's published standard.

54.    The Defendants collectively designed, engineered, tested, validated, manufactured and placed in the stream of commerce the Fuel Pump in a manner that subjects Class members to an unreasonable risk of death or injury.   Despite producing a defective Fuel Pump, Subaru marketed and sold the Class Vehicles, and has, at all times, uniformly branded the Class Vehicles as safe and dependable.

## I.    THE OPERATION OF CLASS VEHICLES' LOW-PRESSURE FUEL PUMP

55.    The Class Vehicles are equipped with a Denso low-pressure fuel pump with a part number prefix 42022 (the "Fuel Pump").

56.    All Class Vehicles are equipped with the same or substantially similar defective Fuel Pump.

57.    The Fuel Pump assembly is mounted inside the fuel tank.  The Fuel Pump assembly consists of a fuel intake strainer at one end and a fuel output line at the other.  At the heart of the Fuel Pump assembly is an electric motor with a plastic

impeller attached to a rotating shaft.  Protruding from the side of the Fuel Pump

assembly is a fuel level float and a fuel level sender.  Figure One illustrates the parts

of the Fuel Pump assembly.



*Figure 1 Fuel Pump Assembly Diagram*[5]

58.     As the electric motor rotates, the impeller spins generating negative

pressure.  The negative pressure pulls fuel into the pump housing while it passes

---

[5] http://www.agcoauto.com/content/news/p2_articleid/195 (last visited January 30, 2020).

through the electric motor assembly and exits through the output, into the fuel line and forward to the fuel filter.  After exiting the fuel filter, the fuel flow is accelerated via a high pressure pump which delivers pressurized fuel to injectors mounted in the engine.  Figure Two illustrates this sequence.



*Figure 2 Fuel Pump Sequence*[6]

59.    At all times, by design, the Fuel Pump assembly and all its components are exposed to gasoline within the tank.  Fuel pumps are designed to survive the harsh environment for at least 200,000 miles.[7]

---

[6] https://www.autoplusdubai.net/blog/fuel-pumps-common-causes-and-how-to-identify-it/ (last visited April 22, 2020).
[7] https://www.autoblog.com/2015/11/24/how-long-does-a-fuel-pump-usually-last/ (last visited April 22, 2020).

## II.    THE CLASS VEHICLES SUFFER FROM A FUNDAMENTALLY DEFECTIVE FUEL PUMP

60.    As described herein, the Class Vehicles' Fuel Pump suffers from a fundamental defect causing it to prematurely fail.    Based on Subaru's own admission, the failure results from a defectively designed plastic impeller.

61.    Subaru's goal in designing a Fuel Pump must be to design one that operates safely for the life of the vehicle.    The Fuel Pump assembly in the Class Vehicles was underdesigned.    Specifically, as Subaru admitted in the Recall Report, "the impeller may become deformed enough to interfere with the body of the fuel pump, potentially causing the low pressure fuel pump to become inoperative."[8]

62.    Plastics absorb liquids, typically.    However, the degree of absorption varies depending on the type of plastic and its environmental conditions.    When plastics absorb liquid, such as gasoline, the plastic pieces' intended dimensions change.    Therefore, manufacturers like Subaru must adequately design and validate plastic materials exposed to liquids to ensure that they remain dimensionally stable.

63.    Subaru admitted Denso's impeller was poorly designed to the point it cannot remain dimensionally stable under its intended conditions.    Specifically, Subaru admitted in the Recall Report that Denso's impeller deformation "may interfere with the body of the fuel pump" causing it to fail and become inoperable.[9]

---

[8] Exhibit A
[9] *Id.*

64.    The Defendants did not design the Fuel Pump and impeller with the necessary robustness to operate safely under normal operating conditions.

65.    At the time Defendants' designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the Fuel Pump, they were aware of, and had access to, reasonable alternative designs.  Such designs would mitigate or eliminate the Fuel Pump Defect.

66.    For example, Defendants could have mitigated or eliminated the Fuel Pump Defect by using different designs and/or materials where:

    a.    The impeller was not fuel permeable under intended and foreseeable purposes;

    b.    The impeller would not lose its dimensional stability under intended and foreseeable purposes; and/or

    c.    The impeller would not contact the fuel pump bod under intended and foreseeable purposes.

67.    Nevertheless, Defendants designed, engineered, tested, validated, manufactured, and placed in the stream of commerce Class Vehicles equipped with the defective Fuel Pumps that causes an unreasonable risk of injury or death the Plaintiffs, Class members, and others.

III. **THE DESIGN FLAW REDUCES ENGINE POWER, CAUSES VEHICLE STALLING, AND CAN LEAVE THE CLASS VEHICLES COMPLETELY INOPERABLE COMPROMISING CONSUMER SAFETY**

68.     The Fuel Pump Defect in the Class Vehicles exposes occupants and others to extreme danger, even death.  In fact, Subaru tacitly admitted as much in the Recall Report, stating the Fuel Pump Defect can "increas[e] the risk of a crash."[10]

69.     The Fuel Pump is an integral component of safe vehicle operation.  But as described herein, the Class Vehicles suffer from a fundamental design flaw that causes the Fuel Pump to prematurely fail.  As Subaru admitted in the Recall Report, the deformed impeller comes in contact with the Fuel Pump body, creating excessive running resistance, causing:

> the check engine warning light or malfunction indicator light [to] illuminate, and/or the engine may run rough.  In the worst case, an inoperative fuel pump may result in the engine stalling without the ability to restart the vehicle, increasing the risk of a crash.[11]

70.     Engines necessarily require steady gasoline supply in order to function properly.  The Fuel Pumps' primary purpose is to transfer gasoline from the tank to the engine. But when the Fuel Pump fails, gasoline is not supplied to the engine, causing reduced engine power, stalling, and/or engine shutdown.

---

[10] Exhibit A, P. 5.
[11] *Id.*

71.     Compounding the problem, Fuel Pump Defect occurs spontaneously with no advance warning to the consumer, thereby creating an extremely dangerous condition for drivers, including those on the road who may be left helpless and unable to take action to get out of the way of oncoming traffic or reach safety.

72.     Class members' complaints set forth below exemplify the real-world dangers caused by the Fuel Pump Defect.

73.     Vehicle manufacturers like Subaru monitor NHTSA and other databases for consumer complaints as part of their ongoing obligation to uncover and report potential safety-related defects. Accordingly, Subaru knew, or should have known, of the many complaints lodged with NHTSA and elsewhere about the specific safety hazard that is the subject of the Recalls.

74.     By way of example, the consumer complaints set forth below are a mere sampling that demonstrate the seriousness of the Fuel Pump Defect and Subaru knew or should have known about it.

75.     Many Class members who own a Recalled Vehicle complained of the Fuel Pump Defect to NHTSA.  For example, on February 7, 2020, the owner of a 2019 Subaru Ascent filled the following complaint with NHTSA:

> VEHICLE LOSES POWER AFTER RAPID ACCELERATION ABOVE 45MPH. A WHOOSHING SOUND OCCURS AND THEN ACCELERATION IS LIMITED. ALL WARNING LIGHTS FLASH INCLUDING "CHECK ENGINE." THIS HAS OCCURRED ONCE ABOUT A MONTH AGO AND

> DIAGNOSED AS A POORLY REPLACED GAS CAP—
> ALTHOUGH IT WAS ACTUALLY ON SECURELY. IT
> OCCURRED 2 WEEKS LATER 3 MORE TIMES
> WITHIN TWO DAYS. I BROUGHT IT IN WITH THE
> LIGHTS ON AND ISSUE STILL OCCURRING TO
> SUBARU PACIFIC. THEY CLEARED CODES AND
> TRIED TO RECREATE ISSUE WITHOUT SUCCESS.
> THEY RELEASED THE CAR BACK TO ME AFTER
> CORPORATE DEFERRED TO THEM. UPON
> DRIVING OUT OF DEALERSHIP, THE SAME THING
> HAPPENED ONLY AFTER ACCELERATION ABOVE
> 18 MPH—ALL WARNING LIGHTS BACK ON AND
> SPUTTERING/JERKING/LOSS OF POWER.
> WHOOSHING SOUND. DEALER IS IN POSSESSION
> OF THE CAR AGAIN TO LOOK INTO IT. ALSO,
> THISE TENDS TO BE A GREY-BLUE HUE TO THE
> EXHAUST EACH TIME CAR STARTS.[12]

76.     On July 25, 2019, the owner of a 2019 Subaru Ascent filed the following complaint with NHTSA:

> WHEN HOLDING SPEED CONSTANT BETWEEN
> APPROXIMATELY 20-35 MPH, OR UNDER VERY
> LIGHT ACCELERATION IN THIS RANGE, VEHICLE
> SEEMS TO JERK, SURGE, PULSE, OR SIMILAR. IT
> FEELS SIMILAR TO BEING IN THE CAR WITH
> SOMEONE LEARNING TO DRIVE A MANUAL
> TRANSMISSION[13]

77.     On September 12, 2019, the owner of a 2019 Subaru Impreza filed the following complaint with NHTSA:

> CAR STOPPED RUNNING WHILE DRIVING DOWN
> THE STREET. AUTOMOBILE WAS TOWED TO
> DEALER YESTERDAY (9-11-19). DEALER, CALLED

---

[12] NHTSA Complaint 11307822.
[13] NHTSA Complaint 11234998.

TODAY (9-12-19) SAID PROBLEM IS A BAD FUEL PUMP AND MAY TAKE UP TO A MONTH TO GET THE ORDERED PART DELIVERED AND INSTALLED. NEW VEHICLE PURCHASED APRIL, 2019 A LITTLE LESS THAN 2800 MILES ON ODOMETER.[14]

78.     Subaru's knowledge of the Fuel Pump defect but failure to timely and adequately notify Class members and repair the defect is unconscionable and creates an unreasonable risk of injury or death to Plaintiffs, Class members, or others.

79.     The Fuel Pump Defect goes beyond the Recalled Vehicles, however, and affects all Class Vehicles equipped with the same defective Denso Fuel Pump. For example, on January 17, 2017, the owner of a 2013 Subaru Outback filed the following complaint with NHTSA:

ON MULTIPLE OCCASIONS, THE VEHICLE STALLED, AS IN THE ENGINE DIED. THIS IS AN INTERMITTENT PROBLEM. USUALLY IT HAPPENS WHEN THE VEHICLE IS STARTED, THE ENGINE WILL DIE, THIS WILL HAPPEN 2-3 TIMES ON EACH OCCURRENCE. IT DOES EVENTUALLY START AND RUN CORRECTLY. A SIMILAR ISSUE OCCURS WHEN COMING TO A STOP. THE ENGINE WILL "FLUTTER" ALMOST DIE AND THEN RESUME NORMAL OPERATION. SO FAR IT HAS NOT LEFT US STRANDED, HOWEVER, I AM CONCERNED AS TO WHAT THE PROBLEM MIGHT BE AND AT WHAT POINT WILL IT STALL AND NOT START AGAIN. I PLAN ON TAKING IT TO MY DEALERSHIP AND HAVE THEM LOOK AT IT, HOWEVER, THE ENGINE LIGHT HAS NOT COME ON SO I DON'T EXPECT THE COMPUTER HAS

---

[14] NHTSA Complaint 11255104.

STORED ANY CODES FOR THE MECHANIC TO BE
ABLE TO TROUBLESHOOT.[15]

80.    On April 17, 2017, the owner of a 2013 Subaru Outback filed the

following complaint with NHTSA:

> ISSUE:   OCCASIONAL   NON-RESPONSE   WHEN
> DEPRESSING         THE          ACCELERATOR.
>
> 1ST OCCURRENCE ABOUT THREE WEEKS AGO
> HAPPEN WHEN I STOPPED FOR A LIGHT AND
> THEN      ATTEMPTED      TO      ACCELERATE.
> DEPRESSING THE PEDAL HAS NO RESPONSE,
> ATTEMPTED THIS THREE TIMES. THE RPM
> GAUGE REFLECTED IT WAS RUNNING. I TURNED
> ON THE CAR AND STARTED IT AGAIN AND IT
> WORKED.
>
> 2ND OCCURRENCE HAPPENED AGAIN AFTER A
> STOP.      SAME      AS      ABOVE.
>
> 3RD OCCURRENCE MAY 6 2017 RETURNING
> FROM BWI IN BALTIMORE ON THE INTERSTATE,
> I WAS IN HEAVY TRAFFIC. I HAD TO SLOW
> QUICKLY FOR A TRUCK AND THEN SAW AN
> OPENING IN THE LEFT LANE AND PULLED OUT
> INTO THE LEFT LANE AND ATTEMPTED TO
> ACCELERATE WITH NO RESPONSE. A CAR
> MOVING FAST IN THE LEFT LANE ALMOST HIT
> ME SINCE I COULD NOT ACCELERATE. I PUMPED
> THE ACCELERATOR TWICE AND IT THEN
> ACCELERATED.
>
> 4TH OCCURRENCE MAY 6TH 2017 DEPARTING A
> PARKING LOT I WAS MOVING SLOWLY THEN
> ATTEMPTED      TO      ACCELERATE      AND
> EXPERIENCED A DELAYED RESPONSE. PUMPED

---

[15] NHTSA Complaint 10945876.

THE PEDAL TWICE TO GET THE RESPONSE.

WENT TO A SUBARU DEALER AFTER THE FIRST
TWO OCCURRENCES AND THEY SAID THEY
COULD NOT IDENTIFY THE PROBLEM. THE
DEALER CALLED AGAIN AND REQUESTED WE
BRING THE CAR IN AGAIN APRIL11TH.

A WEB SEARCH REVEALED ABOUT 24 OTHIS
LIKE OCCURRENCES WITH OUTBACK ABOUT
THE SAME YEAR AND MAKE.[16]

81.    On March 8, 2013, the owner of a 2013 Subaru Impreza filed the

following complaint with NHTSA:

VEHICLE WILL NOT START AFTER AN EXTENDED
PERIOD OF ATTEMPTS. APPEARS TO HAPPEN
MOST OFTEN WHEN VEHICLE IS PARKED (EITHIS
INDOORS OR OUTSIDE) FOR MORE THAN
SEVERAL HOURS. CAR WILL CRANK OVER FOR
10+ SECONDS AND WILL NOT START. AFTER
MULTIPLE ATTEMPTS, CAR HAS STARTED
EVENTUALLY.

HAVE COMMUNICATED WITH DEALER AND SIA
OFFICES THAT I HAVE NOTICED THE CAR WILL
MAKE WHIRRING NOISES THAT COME FROM THE
BACK RH SIDE OF VEHICLE - AND ALSO A
CLICKING NOISE NEAR CENTER OF DASH WHEN
TURNED OFF AND SITTING. THIS WILL GO ON
FOR OVER 5 MINUTES AT A TIME, WHICH MUST
DRAIN BATTERY SINCE CAR IS NOT TURNED ON
OR ENGINE RUNNING. WAS TOLD BY DEALER
THAT THIS IS THE EMISSION SYSTEM "PURGING"
ITSELF - AND IS CONSIDERED NORMAL FOR THIS
VEHICLE. SIA OFFICES CONFIRMED THIS AND
ALSO STATED THAT NOTHING IS NOTED IN THE

---

[16] NHTSA Complaint 10971205.

CURRENT OWNERS MANUAL WHICH EXPLAINS THIS                                    FEATURE.

MY CONCERN IS THAT THE CAR IS UNABLE TO START WHEN REQUIRED TO - AND AM GUESSING THAT IT MIGHT BE RELATED TO THIS UNUSUAL FEATURE... . REGARDLESS OF ORIGIN, SAFETY ISSUE WITH CAR NOT STARTING AND BEING READY TO OPERATE WHEN NORMAL STARTING PROCEDURES ARE FOLLOWED. *TR[17]

82.    On January 25, 2017, the owner of a 2013 Subaru Legacy filed the

following complaint with NHTSA:

THE CAR INTERMITTENTLY LOSES POWER WHEN ACCELERATING FROM A STOPPED POSITION. MOST OFTEN HAPPENS WHEN I AM TURNING LEFT. SUBARU SAYS THISE ARE NO COMPUTER CODES IN THE CHECK ENGINE HISTORY. CAUSE UNKNOWN BUT SPECULATION ADVANCED ABOUT NEURAL NETWORK LEARNING OF THE COMPUTER (SEEMS WORST AFTER RECENT ENGINE REBUILD UNTIL CAR WAS DRIVEN FOR A COUPLE OF DAYS WHISE FREQUENCY OF POWER LOSS DIMINISHED BUT NOT GO AWAY). ALSO PROPOSED: 87 OCTANE GAS-SHOULD USE 92, IF NOT 97 ONLY FROM OIL COMPANY STATIONS, NOT FRED MEYER OR COSTCO EVEN THOUGH CAR IS RATED TO ACCEPT 87 OCTANE GAS. OTHIS HYPOTHESES: FULL GAS TANK VS 1/2 OR LESS , FUEL STARVATION CAUSES POWER DROP (NOTE: ENGINE DOESN'T FULLY DIE & CAN BE COAXED BACK TO LIFE BY PUMPING THE ACCELERATOR), ELECTRONIC IGNITION SYSTEM PERHAPS THE CULPRIT. THIS PROBLEM IS DANGEROUS BECAUSE OF THE RANDOM & SUDDEN

---

[17] NHTSA Complaint 10502043.

(WITHOUT WARNING) LOSS OF POWER WHICH ANY DRIVER IMMEDIATELY BEHIND MY CAR WOULD NOT BE EXPECTING & THISEBY CAUSE A REAR-END COLLISION. ALSO, DANGEROUS WHEN ENTERING A LANE OF TRAFFIC & SUDDENLY THE POWER IS GONE JUST WHEN YOU NEED ACCELERATION IN ORDER TO MERGE AT TRAFFIC SPEED INTO YOUR LANE. SOMETIMES PROBLEM OCCURS WHEN GOING UP A LOW ANGLE INCLINE (EST. 10-15 DEGREES?) BUT NOT NECESSARILY. WHEN LEAVING A STOPPED POSITION, IF LEFT FOOT IS ON THE BRAKE & RIGHT IS SLIGHTLY ACCELERATING IN ORDER TO PULL AWAY MORE RAPIDLY FROM STOPPED POSITION, THE CONTROLLING COMPUTER WILL SOMETIMES PROVIDE ZERO POWER TO THE ACCELERATOR BUT THIS HAPPENS ONLY OCCASIONALLY & OFTEN WILL WORK JUST FINE TO GIVE THE EXTRA ACCELERATION NEEDED. SUBARU SAYS THIS CONFUSES THEIR COMPUTER & IT WILL SHUT DOWN BUT I HAVE FOUND THAT THIS HAPPENS ABOUT 1/3 OF THE TIME, IN MY EXPERIENCE. DANGER COMES FROM LOSING POWER DURING THE TIME YOU NEED IT THE MOST ESP. LEFT TURNS WHICH CROSS TRAFFIC LANES BEFORE YOU CAN MERGE AND DRIVING COMPLETELY NORMALLY. *TR [18]

83.    On March 15, 2020, the owner of a 2014 Subaru Outback filed the

following complaint with NHTSA:

DELAYED GAS PEDAL RESPONSE=HESITATION TO ACCELERATE WHEN GAS PEDAL ENGAGED FROM A STATIONARY STOP. I HAVE EXPERIENCED THIS FAILURE TO ACCELERATE THE VEHICLE FROM A STOPPED POSITION IN

---

[18] NHTSA Complaint 10947694.

EXCESS OF 25 TIMES OVER A MORE THAN 5
YEAR PERIOD.

THE SUBARU IS NOT MINE BUT A RELATIVES
CAR.

IN EARLY FEBRUARY 2019, I WAS STOPPED AT A
LIGHT ATTEMPTING TO MAKE A LEFT HAND
TURN.

TRAFFIC COMING AT ME WAS UP A HILL WITH A
GRADE OF 6% OR MORE WHICH LIMITED THE
LINE OF SIGHT FOR SOMEONE WANTING TO
MAKE A LEFT HAND TURN AT THAT
INTERSECTION. AS I STEPPED ON THE GAS TO
MAKE THE TURN THISE WAS NO RESPONSE
FROM THE CAR. THE CAR

COMING UP THE HILL WAS UPON ME. I PUMPED
THE GAS SEVERAL TIMES AND LUCKILY WAS
ABLE

TO MAKE IT THROUGH THE INTERSECTION. MY
WIFE AND I WERE INCHES AWAY FROM BEING
WACKED BY THE OTHIS CAR. THE CAR
APPROACHING HAS A SPEED LIMIT OF 45 MPH
BUT WAS

MOST LIKELY TRAVELING IN EXCESS OF 45
MPH. ONCE THROUGH THE INTERSECTION, WE
PULLED TO THE CURB TO GATHIS OURSELVES.

THAT'S WHEN I SAID ENOUGH IS ENOUGH AND
SENT TWO LETTERS TO TOM DOLL OF SUBARU.
ONE

IN FEBRUARY & APRIL 2019. HE OF COURSE
PASS IT ON TO CSERVICE. THE INDIVIDUAL
WROTE

BACK SAYING NOTHING IS WRONG.

I AM A PROFESSIONAL ENGINEER AND HAVE
BEEN FOR MANY YEARS. I POINTED OUT ALL
ENGINEERS INCLUDING AUTOMOTIVE
ENGINEERS MUST ADHISE TO A CODE OF
ETHICS & ADHISE TO THE "HIGHEST
STANDARDS OF HONESTY AND INTEGRITY, AND
MUST BE DEDICATED TO THE PROTECTION OF
THE PUBLIC HEALTH, SAFETY AND WELFARE
AND MUST ADHISE TO THE HIGHEST
PRINCIPLES OF ETHICAL CONDUCT." THAT
MEANT NOTHING TO SUBARU.

CLEARLY FROM MY EXPERIENCE THISE IS A
PROBLEM WITH THE 2014 SUBARU OUTBACK
AND IT'S

RANDOM FAILURE TO ACCELERATE DUE TO A
DELAYED GAS PEDAL RESPONSE. [19]

84.    On February 3, 2019, the owner of a 2014 Subaru Outback filed the

following complaint with NHTSA:

3 TO 15 SECOND HESITATION IN THROTTLE
RESPONSE. LAST INCIDENT NEARLY RESULTED
IN A COLLISION. I STOPPED WAITING FOR
TRAFFIC TO CLEAR BEFORE MAKING AN LEFT
TURN. MADE THE LEFT TURN, GENTLY APPLIED
THE THROTTLE PEDAL, NO RESPONSE, PUSHED
IT TO MAXIMUM TRAVEL, STILL NO RESPONSE,
CAR COMING TOWARD ME IN ONCOMING LANE,
THEN MY CAR SUDDENLY ACCELERATED SO
THAT A COLLISION WAS AVOIDED. CITY 2 LANE
STREET, TURNING LEFT. [20]

---

[19] NHTSA Complaint 11318118.
[20] NHTSA Complaint 11173783.

85.    On August 17, 2017, the owner of a 2014 Subaru Outback filed the

following complaint with NHTSA:

> ACCELERATION FROM A STOP OR SLOW SPEED
> TAKES 5-6 SECONDS FOR A PROPER RESPONSE.
> TURNING LEFT IS A VERY REAL PROBLEM OR
> PULLING INTO ON COMING TRAFFIC. I HAVE YET
> TO HAVE AN ACCIDENT BECAUSE I AM
> EXTREMELY CAREFUL, BUT HAVE COME
> FRIGHTINGLY CLOSE A FEW TIMES. CAN THIS
> PROBLEM                              BEFIXED?
>
> THIS HAPPENS WHEN THE VEHICLE IS
> STATIONARY, TURNING,BRAKING (SLOWING
> DOWN AND THEN TRYING TO GO BACK TO
> NORMAL SPEED. THIS HAPPENS ON
> INTERSTATES, AROUND TOWN, ETC[21]

86.    On April 24, 2017, the owner of a 2015 Subaru Outback filed the

following complaint with NHTSA:

> AT TIMES WHEN YOU PRESS THE ACCELERATOR
> FROM A STOP IT TAKES 5 OR 6 SECONDS TO
> RESPOND.I WAS PULLING ON TO THE HIGHWAY
> TURNING LEFT.THIS COULD BE A VERY
> DANGEROUS OR EVEN FATAL INCIDENT IF THISE
> WAS ONCOMING TRAFFIC.READING FROM THE
> INTRNET I SEE THAT THIS HAS BEEN A PROBLEM
> AS FAR BACK AS 2013.SOMEONE NEEDS TO FIX
> THIS PROBLEM BEFORE SOMEONE DIES.[22]

87.    On May 20, 2015, the owner of a 2014 Subaru Outback filed the

following complaint with NHTSA:

---

[21] NHTSA Complaint 11015970.
[22] NHTSA Complaint 10980329.

VEHICLE HESITATES OCCASIONALLY ON
ACCELERATION COMING OFF A STOP.[23]

88.     On October 24, 2014, the owner of both a 2014 Subaru Legacy and a

2013 Subaru Impreza filed the following complaint with NHTSA:

> VEHICLE HAD A 2-5 SECONDS ACCELERATION
> HESITATION. TAKING OFF FROM A YIELD SIGN
> AND GOING ACROSS A HWY, THE CAR HAD
> ENOUGH POWER TO ROLL FORWARD. TRIED
> FLOORING THE ACCELERATOR, BUT ALSO DID
> NOT RESPOND TO FULL THROTTLE UNTIL AFTER
> A FEW SECONDS THE CAR STARTED TO SLOWLY
> MOVE. THE ENGINE IS ON LOW RPMS AND DOES
> NOT LAUNCH FORWARD AS TO INDICATE A
> TRANSMISSION ISSUE..... IT LOOKS MORE LIKE A
> FUEL DELIVERY OR THROTTLE SENSOR ISSUE.
>
> I ALSO HAD THIS SAME ISSUE WITH A 2013
> SUBARU IMPREZA (TRADED IN THE IMPREZA
> THINKING IT WAS A QUIRK WITH THE CAR).
> SUBARU DEALER WAS NOT BEEN ABLE TO
> REPRODUCE THE ISSUE ON THE IMPREZA OR THE
> ON THE LEGACY. NO ERROR CODES PRESENT.
>
> I CONTACTED SUBARU OF AMERICA, I WAS
> INSTRUCTED TO TAKE THE CAR (LEGACY) TO
> THE DEALER. THE TECHNICIAN WAS NOT ASKED
> TO ATTACH ANY KIND OF DIAGNOSTIC
> EQUIPMENT TO POSSIBLY CAPTURE VALUABLE
> DATA IN THE EVENT THAT THE ISSUE WAS
> REPRODUCED. WHEN THE PROBLEM HAS
> MANIFESTED, I HAVE ACCELERATED FROM A
> COMPLETE STOP OR FROM A SLOW ROLLING
> YIELD, THEN 2 - 5 SECOND DELAY IN
> ACCELERATION - VERY SLOW ROLL FORWARD. I
> SHARED THIS INFORMATION WITH THE DEALER.

---

[23] NHTSA Complaint 10717533.

> MY FAMILY AND I ALMOST GOT HIT A FEW WEEKS AGO BY A CAR GOING AROUND 60 MPH AND I WAS ALMOST HIT WHEN DRIVING THE IMPREZA (LET THE CAR ROLL BACK TO AVOID BEING HIT - I WAS ON SMALL INCLINE LEAVING MY NEIGHBORHOOD AND TRYING TO MERGE ONTO A HWY).
>
> MANY SUBARU OWNERS ARE HAVING THE SAME ISSUE (OLD / NEW VEHICLES). THISE ARE SOME BLOGS WHISE CUSTOMERS MENTION HAVING BEEN IN AN ACCIDENT BECAUSE OF THIS ISSUE AND PLENTY OF BLOGS WHISE CUSTOMERS REPORT THE PROBLEM AND FRUSTRATION WHEN THE PROBLEM CANNOT BE REPRODUCED AND ARE SENT HOME WITHOUT A FIX.
>
> HOW CAN SAFERCAR.GOV HELP COMMUNICATE THE IMPORTANCE OF THE ISSUE TO SUBARU BEFORE A FATALITY? *TR[24]

89. On November 15, 2014, the owner of a 2014 Subaru Legacy filed the following complaint with NHTSA:

> I PURCHASED MY BRAND NEW 2014 SUBARU LEGACY ON MAY 16TH 2014. ABOUT ONE WEEK LATER I WAS DRIVING UP THE SLIGHT INCLINE OF THE DRIVEWAY OF THE APARTMENT HOUSE WHISE I LIVE. AS I REACHED THE STREET I STEPPED ON THE ACCELERATOR TO TURN OUT INTO THE TRAFFIC AND THE CAR COMPLETELY LOST POWER. ABOUT 5 SECONDS LATER THE POWER RETURNED AND THE CAR RESPONDED NORMALLY WHEN I STEPPED ON THE ACCELERATOR PEDAL AND I WAS ABLE TO DRIVE THE CAR NORMALLY. THREE OR FOUR

---

[24] NHTSA Complaint 10649644.

> DAYS LATER THE SAME THING HAPPENED AGAIN WHILE I WAS DRIVING IN TRAFFIC, AS I TRIED TO ACCELERATE THE CAR'S ENGINE LOST POWER WHEN I STEPPED ON THE ACCELERATOR. THIS SAME LOSS OF POWER NOW HAPPENS ABOUT TWO OR THREE TIMES EACH WEEK. I CURRENTLY HAVE ABOUT 2500 MILES ON THE CAR. I HAVE TAKEN IT TO MY LOCAL SUBARU DEALERSHIP ON THREE SEPARATE OCCASIONS FOR THIS COMPLAINT AND THEY HAVE KEPT THE CAR FOR A TOTAL OF ABOUT THIRTY DAY FOR OBSERVATION, TESTING, AND REPAIR BUT THEY HAVE BEEN UNABLE TO REPRODUCE OR SOLVE THE PROBLEM AND CAN FIND NOTHING WRONG WITH MY CAR. THEY WARNED ME ABOUT DRIVING WITH TWO FEET BECAUSE IF THE BRAKE IS APPLIED AT THE SAME TIME AS THE ACCELERATOR A PROBLEM LIKE THIS COULD OCCUR BUT I DO NOT DRIVE USING BOTH FEET AND HAVE ALWAYS DRIVEN USING ONLY ONE FOOT. *TR [25]

90. On August 12, 2017, the Owner of a 2015 Subaru Outback filed the following complaint with NHTSA:

> GAS PEDAL SENSOR DOSE NOT RESPOND ON TAKE OFF FROM STOPPED VEHICLE. HAVE ALMOST BEEN T-BONE 5-6 TIMES. ALSO FROM A COST TO PUTTING PRESSURE ON PEDAL IT FAILS TO RESPOND. ON LEFT TURNS YOU ARE A SITTING DUCK NOT KNOWING IF PEDAL WILL RESPOND OR YOU ARE SITTING OUT IN FRONT OF SOME CLOSING IN ON YOU AT HIGH RATE SPEED .

[25] NHTSA Complaint 10655186.

> THIS HAS HAPPENED 10 -12 TIMES ON HIGHWAYS
> AN CITY STREETS .[26]

91.     On April 6, 2020, the owner of a 2015 Subaru Outback filed the

following complaint with NHTSA:

> TL* THE CONTACT OWNS A 2015 SUBARU
> OUTBACK . THE CONTACT STATED THAT THE
> VEHICLE FAILED TO START. THISE WERE NO
> WARNING LIGHTS ILLUMINATED. THE LOCAL
> DEALER WAS NOT CONTACTED. THE
> MANUFACTURER WAS CONTACTED BUT NO
> FURTHIS ASSISTANCE WAS PROVIDED. THE
> FAILURE MILEAGE WAS 69,000. [27]

92.     On February 12, 2019, the owner of a 2015 Subaru Outback filed the

following complaint with NHTSA:

> THE CAR WOULD STALL WHEN COASTING TO A
> STOP LIGHT OR STOP SIGN A FEW TIMES AND
> HAVE BEEN BACK TO THE DEALER AND CAN'T
> REPLICATED THE PROBLEM. THIS IS A
> DANGEROUS SITUATION AND CAN CAUSE AN
> UNSAFE AND HUGE ACCIDENT WITH MY
> FAMILY. THE CAR WOULD DIE WHILE IN DRIVE
> AND SOMETIMES CAN'T BE RESTARTED. IT'S
> HAPPENING AGAIN AND AFRAID TO DRIVE THE
> CAR SINCE THE DEALER WILL SAY NOTHING IS
> WRONG WITH THE CAR. IT LOOKS LIKE IT'S
> RELATED TO IDLE BEING LOW OR THE CVT
> ACTING UP WHEN TAKING THE FOOT OFF THE
> GAS PEDAL AND TRY TO ACCELERATE FROM A
> DEAD STOP OR COASTING TO A STOP. THIS

---

[26] NHTSA Complaint 11014803.
[27] NHTSA Complaint 11320331.

HAPPENED A FEW TIMES DURING FACTORY
WARRANTY WINDOW.[28]

93.    On May 27, 2016, the owner of a 2015 Subaru Impreza filed the

following complaint with NHTSA:

CAR WILL HAVE A SLOW OR NON RESPONSIVE
START FROM A STOP.. THISE WILL BE A COUPLE
SECOND LAG FROM THE TIME I PRESS ON THE
ACCELERATOR.[29]

94.    On January 2, 2019, the owner of a 2016 Subaru Outback filed the

following complaint with NHTSA:

ON TWO OCCASIONS WHILE DRIVING ON THE
INTERSTATE AT 65-75 MPH WITH NO WARNING
THE GAS PEDAL STOPPED RESPONDING TO
INPUTS. WHILE MANEUVERING THE VEHICLE TO
THE SHOULDER OF THE ROAD THROUGH
TRAFFIC THE ENGINE SHUTOFF. ON ONE
OCCASION I WAS ABLE TO RESTART THE
VEHICLE AND ON THE SECOND OCCASION IT
WOULD NOT RESTART. AFTER TOWING THE
VEHICLE TO A REPAIR SHOP THE VEHICLE
STARTED UP AND RAN WITH NO ISSUES. NO
CHECK ENGINE LIGHTS WERE EVER DISPLAYED.
THE BATTERY WAS WORKING FINE AND FULLY
CHARGED. THE CAR IS IN PERFECT MECHANICAL
SHAPE    WITH    ALL    REGULAR    SERVICE
PERFORMED. THE GAS REMAINING AT TIME OF
INCIDENT WAS APPROXIMATELY 1/4 TANK FULL.
THE CAUSE IS UNKNOWN TO ME.[30]

---

[28] NHTSA Complaint 11176539.
[29] NHTSA Complaint 10871184.
[30] NHTSA Complaint 11164684.

95.    On July 13, 2018, the owner of a 2016 Subaru Outback filed the following complaint with NHTSA:

> AFTER STOPPING AT A STOP SIGN ON A CITY STREET, I TRIED TO ACCELERATE BUT THISE WAS A LONG HESITATION FOLLOWED BY A SURGE OF POWER. THIS HAPPENED ON 2 OCCASIONS. I HAD THE SALES MAN DRIVE THE VEHICLE AND ALSO THE SERVICE MANAGER DROVE IT FOR 1 WEEK - NEITHIS TIMES DID THIS ISSUE REPEAT ITSELF. THE DEALERSHIP DID NOT HAVE ANY KNOWLEDGE OF THIS TYPE OF PROBLEM. I REFUSED TO DRIVE THIS VEHICLE AND RETURNED IT TO THE SUBARU DEALER IN BERLIN, CT. [31]

96.    On January 29, 2020, the owner of a 2017 Subaru Outback filed the following complaint with NHTSA:

> CAR LOST POWER AND ENGINE SHUT DOWN WHILE AT FREEWAY SPEED WITH 1/8 TANK APPARENT REMAINING ON THE GAS GAUGE AND 60 MILES REMAINING ON THE MILES TO GO INDICATOR. ADDED 1 GALLON AT ROADSIDE AND CAR STARTED IMMEDIATELY. ADDED AN ADDITIONAL 15.5 GALLONS AT A STATION 12 MILES FROM POINT THE ENGINE SHUT DOWN. THIS LEAVES BETWEEN 2 AND 2.5 GALLONS OF UNUSED FUEL IN THE TANK AT THE POINT THE CAR SHUT DOWN FROM FUEL STARVATION. [32]

97.    On October 30, 2019, the owner of a 2017 Subaru Outback filed the following complaint with NHTSA:

---

[31] NHTSA Complaint 11111266.
[32] NHTSA Complaint 11302920.

> TL* THE CONTACT OWNS A 2017 SUBARU
> OUTBACK. DURING COLD WEATHIS, THE
> VEHICLE FAILED TO START. THE FAILURE
> OCCURRED EVER SINCE THE VEHICLE WAS
> PURCHASED ON APRIL 15, 2017. THE VEHICLE
> WAS TAKEN TO CAPITAL SUBARU (920 CAPITAL
> EXPRESSWAY AUTO MALL, SAN JOSE, CA 95136)
> ON THREE DIFFERENT OCCASIONS, BUT THEY
> WERE NOT ABLE TO REPLICATE THE FAILURE.
> THE MANUFACTURER WAS NOT NOTIFIED OF
> THE FAILURE. THE VEHICLE WAS NOT
> REPAIRED. THE APPROXIMATE FAILURE
> MILEAGE WAS 38,718. [33]

98.    On May 18, 2019, the owner of a 2017 Subaru Outback filed the

following complaint with NHTSA:

> IN TWO SEPARATE EVENTS THE CAR LOST
> POWER WHILE ACCELLORATING AT HIGHWAY
> SPEEDS TO MERGE INTO TRAFFIC FROM A
> STAND STILL. THE GAS PEDAL BECAME
> UNRESPONSIVE AND THE TRANMISSION
> STOPPED SHIFTING. IN THE FIRST INCIDENT THE
> ENGINE STALLED, AND IN THE SECOND IT
> SPUTTERED AND ALMOST DIED DURING A
> HEAVY MERGE ON AN ON RAMP. NO
> DIAGNOSTIC CODES WERE THROWN, SO THE
> MANUFACTURER CLAIMS THISE IS NOTHING
> WRONG WITH THE CAR. IN THE FIRST INCIDENT
> THE CAR WAS LEAVING THE TOLL PLAZE ON
> THE DULLES GREENWAY HEAD TOWARD
> LEESBURG, VA. UNDER FULL ACELLERATION
> LEAVING THE TOLL PLAZA AND EFFECTIVELY
> DRIVING STRAIGHT, THE CAR STARTED
> SHUFTING ERRATICALLY, AND EVENTUALLY
> LOST POWER AND STALLED. IN THE SECOND
> INCIDENT, ABOUT TWO MONTHS LATER, THE

---

[33] NHTSA Complaint 11277169.

CAR WAS ON A DECLINE ON-RAMP MERGING
INTO HEAVY TRAFFIC ON RT-270N HEADING
TOWARD FREDERICK, MD. THE CAR AGAIN
STARTED TO SHIFT ERRATICALLY, THEN BEGAN
TO STALL, BUT I WAS ABKE TO USE THE PADDLE
SHIFTERS TO SHIFT THE "GEAR" OF THE CVT
AND PREVENT STALLING. AFGER ABOUT 30
SECONDS THE CAR WAS OPERATING AS
NORMAL. AGAIN, THE DEALER HAS NOT FOUND
ANY DIAGNOSTIC CODES, AND INDICATES THISE
IS NITHING WRONG WITH THE VEHICLE. [34]

99.   On November 7, 2019, the owner of a 2017 Subaru Impreza filed the

following complaint with NHTSA:

TL* THE CONTACT OWNS A 2017 SUBARU
IMPREZA. WHEN THE CONTACT ATTEMPTED TO
ACCELERATE, THE VEHICLE LOST POWER. THE
CONTACT WAS ABLE TO DRIVE THE VEHICLE TO
HIS RESIDENCE. THISE WERE NO WARNING
INDICATORS ILLUMINATED. THE VEHICLE WAS
LATER TAKEN TO HISITAGE SUBARU OWINGS
MILLS (9808 REISTERSTOWN RD, OWINGS MILLS,
MD 21117, (888) 553-0026) WHISE THE TECHNICIAN
REPLACED THE BATTERY; HOWEVER, THE
FAILURE RECURRED. THE VEHICLE WAS NOT
TAKEN BACK TO THE DEALER AND WAS NOT
REPAIRED. THE VIN WAS INCLUDED IN NHTSA
CAMPAIGN NUMBER: 19V743000 (ELECTRICAL
SYSTEM). THE MANUFACTURER WAS NOT MADE
OF THE FAILURE. THE FAILURE MILEAGE WAS
APPROXIMATELY 9,500. [35]

100.   On January 24, 2018, the owner of a 2017 Subaru Impreza filed the

following complaint with NHTSA:

---

[34] NHTSA Complaint 11208473.
[35] NHTSA Complaint 11278649.

> I WAS ABOUT TO MAKE A LEFT TURN AT THE
> LIGHT WHEN CAR SUDDENLY STALLED.
> BROUGHT IT TO LIBERTY SUBARU DEALERSHIP
> THE NEXT DAY AND TECH RELEASE IT AS SAFE
> TO DRIVE AFTER THEY CLAIMED TO FIX THE
> MAIN RELAY. A MINUTE AFTER I LEFT THE
> DEALERSHIP CAR STALLED AGAIN NEAR THE
> TRAIN TRACKS. THE 2017 SUBARU IMPREZA IS
> HAZARDOUS, UNSAFE, AND LIFE THREATENING.
> THIS TIME LIBERTY SUBARU SAID THEY HAVE
> TO REWIRE THE ENGINE. I AM NOT
> COMFORTABLE DRIVING THIS CAR WITH MY
> CHILDREN. IT IS NOT SAFE FOR ME, MY FAMILY,
> AND OTHIS DRIVERS.[36]

101.    On April 15, 2019, the owner of a 2018 Subaru Outback filed the

following complaint with NHTSA:

> WHEN I COME TO A STOP AND WAITING TO
> MAKE A LEFT TURN, THE VEHICLE WILL STALL
> WHEN I START TO TURN. ENGINE IS STILL
> RUNNING, BUT THE CAR ESSENTIALLY STOPS IN
> MID TURN. THIS LEAVES ME EXPOSED TO A
> BROADSIDE COLLISION. DEALER DOES NOT
> KNOW WHAT IS CAUSING IT AND IT DOES NOT
> HAPPEN EVERY TIME. IN THE LAST 1000 MILES IT
> HAS OCCURRED 4 TIMES. AFTER THE
> HESITATION, ABOUT 3 -5 SECONDS, IT STARTS TO
> MOVE. IT HAS ALSO OCCURRED WHEN MOVING
> FROM ONE LANE TO ANOTHIS AFTER COMING
> TO A NEAR STOP DUE TO A CLOSED LANE IN THE
> ROAD. [37]

---

[36] NHTSA Complaint 11064614.
[37] NHTSA Complaint 11196562.

102.    On March 16, 2019, the owner of a 2018 Subaru Outback filed the following complaint with NHTSA:

> FUEL DELIVERY PROBLEM. SOMETIMES WHEN STARTING UP FROM A STOP SIGN AND ALL OF A SUDDEN THISE IS NO POWER AND YOU HAVE TO HIT THE ACCELERATOR A COUPLE OF TIMES TO GET THE CAR TO RESPOND. SOMETIMES THIS OCCURS AT LOW SPEED GOING LEFT AND ALL OF A SUDDEN THISE IS NO POWER AND YOU HAVE TO HIT THE ACCELERATOR A COUPLE OF TIMES TO GET IT TO RESPOND. THE ENGINE NEVER STALLS OUT. ON THE EXPRESSWAY IT DROPPED OUT OF CRUSE TWICE. I PULLED UP TO A STOP SIGN TO CROSS INTO TRAFFIC AND IT HAD POWER AT FIRST AND THEN NO POWER. I WAS THEN IN A PANIC MODE PRESSING ON THE ACCELERATOR AND FINALLY IT RESPONDED. THIS IS WHY I THINK IT IS SERIOUS. [38]

103.    On February 1, 2019, the owner of a 2018 Subaru Outback filed the following complaint with NHTSA:

> I WAS DRIVING THROUGH AN INTERSECTION WHEN THE ENGINE STALLED WITH 1/8TH OF A TANK OF GAS REMAINING. GAS LIGHT CAME ON ONLY A FEW MILES PRIOR. LUCKILY I WAS ABLE TO COAST INTO A GAS STATION. CAR STARTED AFTER TURNING OFF AND BACK ON. ONLY TOOK 16.9 GALLONS TO TOP OFF. THIS IS THE SECOND TIME THIS HAS HAPPENED. THE PREVIOUS TIME THE MILES TO EMPTY WAS SHOWING 50 WHEN IT STALLED. I WAS TOLD BY THE DEALERSHIP THAT THISE IS NO FIX FOR THE CURRENT RECALL. [39]

---

[38] NHTSA Complaint 11187279.
[39] NHTSA Complaint 11173593.

104.   On December 19, 2018, the owner of a 2018 Subaru Outback filed the following complaint with NHTSA:

> CAR STALLED AND RAN OUT OF GAS WHEN THE SYSTEM SAID I HAD 20 MILES LEFT. I WAS 2 MILES FROM HOME/GAS STATION. THIS HAPPENED AT A STREET LIGHT ON A BUSY STREET. I HAD TO GET OUT AND PUSH THE CAR OUT OF THE WAY IN 5 LANES OF TRAFFIC. [40]

105.   On September 22, 2018, the owner of a 2018 Subaru Impreza filed the following complaint with NHTSA:

> THE ENGINE DIED WHILE COMING TO A RAPID STOP FROM ABOUT 35-40 MPH. ALL THE LIGHTS ON THE INSTRUMENT PANEL TURNED YELLOW. AFTER PUTTING THE TRANSMISSION PARK THE ENGINE WOULD NOT RESTART. AFTER NUMEROUS ATTEMPTS, REMOVING AND REPLACING THE KEY, AND ABOUT 2 TO 3 MINUTES THE ENGINE DID START. I WAS UNABLE, AFTER A FEW ATTEMPTS, TO REPRODUCE THE PROBLEM. WE TOOK THE CAR TO THE DEALER. THEY STATED THAT THEY HAD NOT SEEN THIS PROBLEM. THEY DID, HOWEVER, PERFORM A SOFTWARE UPDATE IN THE HOPE THAT IT WOULD SOLVE THE PROBLEM. [41]

106.   On June 11, 2018, the owner of a 2018 Subaru Impreza filed the following complaint with NHTSA:

> THE CAR HAS STALLED 3 TIMES WHILE DRIVING. AT A STOP SIGN, RED LIGHT AND AT A STOP

---

[40] NHTSA Complaint 11162588.
[41] NHTSA Complaint 11130767.

> SIGN. THE INCIDENT AT THE TRAFFIC LIGHT
> CAUSED THE VEHICLE TO START ROLLING
> BACKWARDS AND ALMOST HIT INTO ANOTHIS
> VEHICLE. SUBARU CAN NOT FIND THE PROBLEM
> BUT ACKNOWLEDGES THE INCIDENTS OF
> STALLING. THE CAR IS NOT SAFE TO DRIVE AND
> WAS PURCHASED IN THE LATER HALF OF APRIL
> 2018. [42]

107.    Not only did Subaru exclude older model year Class Vehicles, but it also other Subaru models affected by the Fuel Pump Defect.  For example, on September 4, 2019, the owner of a 2019 Subaru Forester filed the following complaint with NHTSA:

> WHILE DRIVING AROUND 30MPH THE CAR WILL
> SOMETIMES HESITATE AND THEN LURCH IF THE
> GAS PEDAL IS VERY LIGHTLY PRESSED.
> SOMETIMES IT WILL DO IT AT HIGHIS SPEEDS AS
> WELL, AROUND 50MPH BUT NOT TYPICALLY AT
> FREEWAY SPEED. HAPPENS ON MOUNTAIN
> ROADS AND CITY STREETS. MOST NOTICEABLE
> WHEN KEEPING SPEED WITH A CAR AHEAD.
> WHEN PRESSING HARDER ON THE GAS PEDAL IT
> IS USUALLY NOT NOTICEABLE. WHEN DRIVING
> IN "SPORT" MODE OR WITH MANUAL PADDLE
> SHIFTERS SET AT 4TH GEAR OR LOWER IT DOES
> NOT HAPPEN. THIS IS A CVT SPORT MODEL.
> DROVE A LOANER OF THE SAME YEAR AND
> TRIM, WHICH SHOWED SIMILAR BEHAVIOR,
> ALTHOUGH LESS COMMON. SUBARU CLAIMS IT
> IS NORMAL BEHAVIOR. [43]

---

[42] NHTSA Complaint 11101252.
[43] NHTSA Complaint 11253275.

108.   On February 7, 2020, the owner of a 2019 Subaru Forester filed the

following complaint with NHTSA:

> THE CAR OCCASIONALLY ACTS LIKE IT GOING
> TO STALL , PRIMARILY WHEN TURNING LEFT AT
> TRAFFIC SIGNALS. THE ACCELERATOR HAS TO
> BE PUSHED HARD TO OVERCOME THE
> APPROXIMATELY 1- 1.5 SECOND DELAY BEFORE
> THE CAR STARTS TO ACCELERATE.
>
> THIS HAS CAUSED NEAR COLLISIONS ON
> SEVERAL OCCASIONS.
>
> THE ENGINE STOP BUTTON WAS ACTIVATED TO
> PREVENT ENGINE STOPPING AT CAR IDLE. [44]

109.   On April 12, 2019, the owner of a 2019 Subaru Forrester filed the

following complaint with NHTSA:

> IN OUR 2 WEEK OLD 2019 FORESTER, WE WERE
> DRIVING ON THE FREEWAY AT 65MPH AND FELT
> A SUDDEN JOLT AND THE CAR SHUT OFF: THE
> LIGHTS ON THE DASHBOARD WENT OFF, THE
> HEADLIGHTS WENT OFF, THE TURN SIGNALS
> WOULD NOT WORK AND THE ACCELERATOR
> WASN'T WORKING. WE GUIDED THE CAR OFF
> THE FREEWAY AND SAT ON THE SIDE OF THE
> FREEWAY. THE DEALER'S MASTER MECHANIC
> CANNOT FIND ANY CODE THAT TELLS THEM
> WHAT IS WRONG SO THEY TELL US THISE IS
> NOTHING TO FIX. THIS IS OUTRAGEOUS. THIS
> WAS A LIFE-THREATENING EVENT SO WE DO
> NOT FEEL SAFE DRIVING THE CAR FOR
> OURSELVES AND OTHIS CARS ON THE FREEWAY.
> SUBARU IS NOT TAKING THIS SERIOUSLY. WE
> READ THISE HAVE BEEN OTHIS "CAR STALL"

---

[44] NHTSA Complaint 11307743.

> PROBLEMS SIMILAR TO OURS WITH FORESTERS
> FROM OTHIS YEARS. [45]

110.    On January 16, 2018, the owner of a 2018 Subaru Forester filed the

following complaint with NHTSA:

> WHEN ATTEMPTING TO ACCELERATE TO MAKE
> A LEFT-HAND TURN THE CAR STOPPED - THE
> ENGINE WOULD NOT GET ABOVE IDLE, EVEN
> WHEN THE ACCELERATOR WAS PRESSED TO THE
> FLOOR. THE CAR STOPPED IN ONCOMING
> TRAFFIC. IT DID ACCELERATE AFTER
> COMPLETELY REMOVING PRESSURE FROM THE
> PEDAL AND PUSHING IT PARTIALLY DOWN
> AGAIN IT BEGAN TO PICK UP SPEED. [46]

111.    On September 5, 2018, the owner of a 2018 Subaru Forester filed the

following complaint with NHTSA:

> TL* THE CONTACT OWNS A 2018 SUBARU
> FORESTER. WHILE DRIVING APPROXIMATELY 80
> MPH, THE VEHICLE SUDDENLY LOST ENGINE
> POWER. THE VEHICLE WAS COASTED TO AN
> EXIT RAMP. THE CONTACT STATED THAT THE
> ENGINE WAS STILL IDLING EXTREMELY LOW
> AND THE VEHICLE WAS TURNED OFF AND
> RESTARTED. RIMROCK SUBARU (324 S 24TH ST
> W, BILLINGS, MT 59102, (406) 651-5200) REPLACED
> THE FUEL PUMP AND FUEL PUMP CONTROL
> MODULE; HOWEVER, THE FAILURE CONTINUED.
> THE DEALER REFERRED THE CONTACT TO THE
> MANUFACTURER AND OFFERED A TRADE-IN
> FOR A 2018 SUBARU OUTBACK. THE
> MANUFACTURER WAS NOT CONTACTED. THE
> VEHICLE WAS NOT REPAIRED. THE

---

[45] NHTSA Complaint 11195742.
[46] NHTSA Complaint 11063153.

APPROXIMATE FAILURE MILEAGE WAS 4,200.
**TR *JB [47]

112.    On December 17, 2019, the owner of a 2017 Subaru Forester filed the

following complaint with NHTSA:

ON THREE SEPARATE OCCASIONS THUS FAR,
WHILE DRIVING APPROXIMATELY 70 MPH ON
INTERSTATE 93 IN MASSACHUSETTS AND NEW
HAMPSHIRE, MY 2017 SUBARU FORESTER
TOURING (WITH 21K MILES) LOST POWER AND
COMPLETELY SHUTDOWN. ALL THREE TIMES, I
WAS LUCKILY ABLE TO STEER THE VEHICLE TO
SAFETY WHILE AVOIDING OTHIS MOTOR
VEHICLES AND NEITHIS MYSELF, MY
PASSENGERS NOR ANYONE ELSE AROUND US
WAS HURT. WHEN THE VEHICLE DECIDES TO
SHUTDOWN, IT FEELS LIKE THE CAR DROPS
ITSELF INTO NEUTRAL, THE RPMS SHOOT UP TO
ABOUT 4500-5000 AND ALL OF THE LIGHTS ON
THE DASHBOARD LIGHT UP. THISE IS ABOUT A
FIVE SECOND WINDOW TO STEER THE VEHICLE
TO SAFETY FROM WHEN YOU FIRST DETECT
THAT THE ISSUE IS OCCURRING. AFTER WAITING
FOR ABOUT 45 MINUTES AFTER THE INCIDENT, I
AM ABLE TO START THE CAR BACK UP AND
DRIVE IT. THIS IS A SERIOUS SAFETY CONCERN
OF MINE (AND IT IS TERRIFYING WHEN IT
HAPPENS) AND I HAVE ALREADY CONTACTED
SUBARU OF AMERICA ASKING FOR A SOLUTION.
I AM NOW CURRENTLY ONLY USING THE CAR ON
SHORT TRIPS AND IF I HAVE TO GET ON THE
HIGHWAY, I STICK TO THE RIGHT LANE AND DO
NOT GO OVER 60 MPH. [48]

---

[47] NHTSA Complaint 11124519.
[48] NHTSA Complaint 11289678.

113.    On January 15, 2020, the owner of a 2015 Subaru Forester filed the following complaint with NHTSA:

> TWO TIMES, WHILE DRIVING ON THE HIGHWAY AT ABOUT 65 MPH, MY CAR LOST THE ABILITY TO ACCELERATE. IT WAS AS THOUGH THE CAR SLIPPED INTO NEUTRAL. I PUSHED THE ACCELERATOR PEDAL AND THE RPM'S WOULD INCREASE, BUT THE CAR WOULDN'T ACCELERATE. IT SIMPLY SLOWED DOWN. BOTH TIMES THE HIGHWAY WAS EMPTY ENOUGH THAT I WAS ABLE TO DRIFT INTO THE SHOULDER.

> ONCE I PULLED OVER, I TURNED OFF THE CAR AND WAITED A FEW MINUTES. WHEN I TURNED IT BACK ON, THE CAR STARTED AND ACCELERATION WORKED AS NORMAL.

> BOTH TIMES I BROUGHT IT TO A LOCAL SUBARU DEALERSHIP, AND AFTER RUNNING SOME TESTS SAID THEY COULDN'T FIND ANY ISSUES, AND COULDN'T HELP ME ANY FURTHIS.

> I'VE FOUND OTHIS PEOPLE WHO HAVE EXPERIENCED VERY SIMILAR PROBLEMS, BUT IT SEEMS LIKE NO ONE HAS FOUND A SOLUTION. [49]

114.    On December 23, 2019, the owner of a 2015 Subaru Forester filed the following complaint with NHTSA:

> WHILE DRIVING ON HIGHWAY AT 70MPH, THE VEHICLE SUDDENLY LOST POWER. THE ENGINE REVVED BUT NO RESPONSE, LIKE IT WAS IN NEUTRAL. THE ENGINE DID NOT COMPLETELY SHUT OFF, AND I WAS ABLE TO GET OVER TO

---

[49] NHTSA Complaint 11299582.

THE SHOULDER. WHILE COASTING ON THE SHOULDER, THE CAR SPUTTERED AS IF IT WAS OUT OF GAS, BUT I HAD 1/4 TANK. IT THEN BEGAN TO RUN NORMALLY. I PULLED OFF TO A GAS STATION, FILLED IT UP, AND CONTINUED MY TRIP WITHOUT A PROBLEM. THE OCCURRENCE WAS VERY DANGEROUS ON A CONGESTED HIGHWAY. [50]

115.    On November 18, 2019, the owner of a 2014 Subaru Forester filed the

following complaint with NHTSA:

2014 SUBARU FORESTER STOPPED RUNNING WHILE DRIVING DOWN THE FREEWAY AT 70 MILES AN HOUR. ENGINE JUST QUITE RUNNING. LOST POWER. HAD TO PULL OVER IN MEDIAN. VERY SCARY. THIS IS SECOND TIME THIS HAS HAPPENED. DID NOT THROW A CODE MESSAGE. DEALERSHIP CAN NOT DETECT PROBLEM. FIRST TIME WAS 4 YEARS AGO WHEN DRIVING AT 35 MPH ON CITY STREET COMING INTO TOWN. DID NOT THROW ERROR MESSAGE AT THAT TIME WAS TOLD TO DRIVE IT UNTIL IT DID IT AGAIN. [51]

116.    On August 17, 2019, the owner of a 2013 Subaru Forester filed the

following complaint with NHTSA:

LACK OF POWER WHEN I TRY TO ACCELERATE. THE VEHICLE FEEL DOES'T GO WHEN I PRESS THE GAS FROM GETTING OUT OF STOP FOR A 10 SECONDS. [52]

---

[50] NHTSA Complaint 11290811.
[51] NHTSA Complaint 11280804.
[52] NHTSA Complaint 11244720.

117.    Subaru knew that the Fuel Pump Defect was present in all Class Vehicles equipped with the defective Denso Fuel Pump, as demonstrated above, but it failed to include those vehicles in the Recall.  Subaru's unconscionable act deprives those Class members not included in the Recall a free and adequate repair, if one is devised.

118.    As demonstrated, the Fuel Pump Defect affects all Class Vehicles, and not just the Recall Vehicles.  Additionally, the Fuel Pump Defect creates an unreasonable risk of injury or death to Plaintiffs, Class members, and others.

119.    The Fuel Pump Defect causes Class Vehicles to become dangerous and inoperable while on the road and therefore they are not fit for their ordinary purpose.

## IV.  SUBARU KNEW ABOUT THE FUEL PUMP DEFECT, BUT CONTINUED TO MANUFACTURE, MARKET, AND SELL CLASS VEHICLES

120.    Subaru knew or should have known about the Fuel Pump Defect, but it concealed or failed to disclose the defect and continued to manufacture, market, and sell its popular Class Vehicles equipped with the Fuel Pump Defect.  Specifically, Subaru knew or should have known the defective Fuel Pumps in the Class Vehicles exposed Class members to extreme danger and, in order to render them safe, the Class Vehicles needed new or enhanced Fuel Pumps that functioned safely and as intended. Nonetheless, Subaru failed to take corrective action.

121.   In fact, Subaru knew or should have known about the Fuel Pump Defect since the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles.  During these phases, Subaru would have gained comprehensive and exclusive knowledge about the Fuel Pumps, particularly the basic engineering principles behind the construction and function of the Fuel Pumps such as their impellers' susceptibility to fuel absorption and deformation.  However, Subaru failed to act on that knowledge and instead installed the defective Fuel Pumps in the Class Vehicles, and subsequently marketed and sold the vehicles to unsuspecting consumers without disclosing the safety risk or warning Class members.

122.   Moreover, Subaru knew about the Fuel Pump Defect based on the number of claims for Fuel Pump Defect repair and replacement that it admits to receiving.[53]

123.   Further. federal law requires automakers like Subaru to be in close contact with NHTSA regarding potential defects.  *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).  Accordingly, Subaru should (and does) monitor NHTSA databases for consumer complaints regarding their automobiles as part of their obligation to identify potential defects in their vehicles, such as the Fuel Pump Defect.

---

[53] Exhibit A.

124.    From its monitoring of the NHTSA databases, Subaru knew or should have known of the many Fuel Pump Defect complaints lodged, such as those quoted in Section III above.  However, Subaru failed to act on that knowledge by warning Class members.

125.    Finally, Subaru knew about the Fuel Pump Defect through its own investigation.  However, Subaru failed to act on that knowledge by warning Class members.

126.    Despite Subaru's extensive knowledge, Subaru failed to act on that knowledge by warning Class members.  Sacrificing consumer safety for profits, Subaru instead chose to enrich itself by using false and misleading marketing to sell the Class Vehicles as safe and durable at inflated prices.

## V.     SUBARU CONTINUOUSLY TOUTED CLASS VEHICLES AS SAFE AND DEPENDABLE, CONCEALING THE FUEL PUMP DEFECT

127.    Subaru's overarching marketing message for the Class Vehicles was that the vehicles are safe and dependable and that their engine can be relied on to perform well.  This marketing message is false and misleading given the propensity of the Fuel Pumps in the Class Vehicles to fail, causing the vehicles' engines to run rough, stall and become inoperable which, as Subaru admits, creates an unreasonable risk of a crash.

128.     Beginning in 2007, Subaru branded itself as "Love: It's What Makes A Subaru."  The "Subaru Love Promise" is the company's vision to show love and respect to everyone, and to support its communities and customers nationwide.[54]

129.     As Subaru's marketing agency, Carmichael Lynch, stated on their website:

> We discovered the reason people came to the brand wasn't rational at all. It was all about love. Subaru drivers loved life. They loved the outdoors. They loved pets. They especially loved the venerable old Subaru they'd been driving forever. The Love campaign was born. In the years since, sales and market share have more than tripled. Love has spread to every level of the brand.[55]

130.     The most important thing Subaru owners and Class members "Loved" about their Subaru vehicles, according to Carmichael Lynch, is safety:

> We've made safety a big part of the storytelling in the Love campaign, which has turned it from rational argument to a deep emotional connection. Ask people what vehicle they'd want their most precious cargo to ride in. The answer is a Subaru.[56]

131.     Subaru sought to attain the number one position in automotive safety through its uniform and pervasive marketing message of safety and dependability.[57]

---

[54] https://www.subaru.com/love-promise.html (last visited April 22, 2020).
[55] https://www.carmichaellynch.com/work/subaru-love/ (last visited April 22, 2020).
[56] *Id.*
[57] *Id.*

132.    Further evidencing Subaru's commitment to branding itself as safe and dependable, on February 14, 2020, Alan Bethke, Senior Vice Present of Marketing for Subaru of America, stated:

> At Subaru, we are proud to produce safe and reliable vehicles that, time and again, have given our owners the ability to create their own adventures and memories. The Outback has earned the highest model loyalty in its class for the past three years, and our latest Outback advertising campaign reinforces our commitment to creating vehicles that not only keep our owners safe on the road, but also enhance their lives. [58]

133.    In addition to its memorable TV and print advertisement, Subaru dedicates a portion of its website demonstrating how safe and dependable Subaru vehicles are, including the Class Vehicles. For example, below is a screenshot from Subaru's website showing the portrayal of its vehicles as safe and dependable.



---

[58] https://www.prnewswire.com/news-releases/subaru-unveils-all-new-marketing-campaign-to-reveal-the-most-advanced-and-reliable-outback-ever-301005274.html (last visited April 22, 2020).

134.     As the caption demonstrates, Subaru asserts: "When you choose a Subaru, you're not just choosing a car.  You're choosing a company with a lifetime commitment to protecting those you love."  However, nowhere does Subaru disclose the Fuel Pump Defect or the grave safety risks it poses.

135.     Subaru made similar representations in older model Class Vehicles, too.  As far back as 2013, Subaru was touting the safety and reliability of its vehicles, including Class Vehicles.  For example, below is a screenshot from Subaru's website in 2013 portraying its message of safety and dependability:[59]



---

[59] http://web.archive.org/web/20130807123214/http://www.subaru.com/why-subaru/livelove.html?referralType=allvehicles (last visited April 22, 2020).

136.   Subaru continued this uniform and pervasive marketing message of safety and dependability for the duration of the Class period—from 2013 to through 2019.

137.   In addition to its general marketing efforts, Subaru also touted the safety and dependability in its Class Vehicle specific advertising.  Subaru retains and makes available on its website the sales brochures for its current and former vehicles. Throughout the brochures, Subaru consistently touts the safety and dependability of its vehicles. For example, below is a screenshot of a 2019 Subaru Outback sales brochure:[60]



138.   Subaru made identical statements in its advertising of the 2019 Subaru Impreza, as the screenshot below demonstrates:[61]

---

[60] https://www.subaru.com/content/dam/subaru/downloads/pdf/brochures/2019/Outback/MY19_OBK_Brochure.pdf (last visited April 22, 2020).
[61]
https://www.subaru.com/content/dam/subaru/downloads/pdf/brochures/2019/Impreza/MY19_IMP_Brochure.pdf (last visited April 22, 2020).



139.    Not only did Subaru advertise the Recalled Vehicles as safe and dependable, but it made similar representations about all Class Vehicles.    For example, below is a screenshot of a 2018 Subaru Impreza sales brochure:[62]



140.    Below is a screenshot of a 2017 Subaru Outback sales brochure:[63]

---

[62]
https://www.subaru.com/content/dam/subaru/downloads/pdf/brochures/2018/Impreza/2018_Subaru_Impreza.pdf (last visited April 22, 2020).
[63]
https://www.subaru.com/content/dam/subaru/downloads/pdf/brochures/2018/Outback/2018_Subaru_Outback.pdf (last visited April 22, 2020).



141.    Below is a screenshot of a 2016 Subaru Forester sales brochure:[64]



142.    Below is a screenshot of a 2015 Subaru Outback sales brochure:[65]



143.    Below is a screenshot of a 2014 Subaru Legacy sales brochure:[66]



---

[65] https://cdn.dealereprocess.net/cdn/brochures/subaru/2015-outback.pdf (last visited April 22, 2020).

[66] https://cdn.dealereprocess.org/cdn/brochures/subaru/2014-legacy.pdf (last visited April 22, 2020).

144.    Below is a screenshot of a 2013 Subaru Outback sales brochure:[67]



145.    Despite Subaru's knowledge of the Fuel Pump Defect and its uniform and pervasive marketing message of safety and dependability, nowhere does Subaru disclose the Fuel Pump Defect or the unreasonable risk to safety it poses, as admitted in the Recall Report.

146.    A car with a defective fuel pump that can cause the engine to studder or stall while the vehicle is in motion, as do the Class Vehicles, and thereby exposes occupants to an unreasonable risk of injury or death *is not a safe car*. Thus, Subaru's marketing of the Class Vehicles as safe and dependable is false and misleading and

---

[67] https://cdn.dealereprocess.net/cdn/brochures/subaru/2013-outback.pdf (last visited April 22, 2020).

omits facts that would be material to consumers such as Class members who purchased or leased Class Vehicles because they consistently marketed as having the utmost safety on the road.

147.   Subaru marketed the Class Vehicles as safe and dependable, but failed to disclose the existence, impact, and danger of the Fuel Pump Defect, despite its knowledge.  Specifically, Subaru:

> a. Failed to disclose, at and after the time of purchase, lease, service, or thereafter any and all known material defects of the Class Vehicles, including the Fuel Pump Defect, despite its knowledge;

> b. Failed to disclose, at and after the time of purchase, lease, service, or thereafter that the Class Vehicles' Fuel Pumps were defective and not fit for their ordinary purpose, despite its knowledge; and

> c. Failed to disclose and actively concealed the existence and pervasiveness of the Fuel Pump Defect, despite its knowledge.

148.   Subaru's deceptive marketing and willful and knowing failure to disclose the Fuel Pump Defect damaged, and continues to damage, Plaintiffs and Class members.  If Plaintiffs and Class members had known of the Fuel Pump Defect and/or that the Class Vehicles were not safe and durable, they would not have purchased or leased the Class Vehicles or certainly would not have paid less to do so.

## VI. SUBARU ADMITTED THE FUEL PUMP DEFECT WAS DANGEROUSLY DEFECTIVE, BUT ISSUED AN INADEQUATE RECALL

149.    On April 16, 2020, Subaru instituted the Recall, a voluntary safety recall of nearly 200,000 vehicles admitted that the defective Fuel Pump prematurely fails, compromising consumer safety.

150.    In connection with the Recall, Subaru identified as the root cause the Denso Fuel Pump with a plastic impeller that deforms due to fuel absorption.

151.    By instituting the Recall, Subaru admitted the Fuel Pump Defect is a serious safety defect that could lead to a crash, which can result in serious injury or death.  However, the Recall was inadequate.

152.    First, Subaru limited the Recall to a subset of the Class Vehicles. Specifically, Subaru limited the Recall to the Recalled Vehicles, which are certain Subaru Class Vehicles manufactured between June 2018 through February 2019 and equipped with a Denso made low-pressure fuel pump.  The Recall omits other Class Vehicles equipped with the same defective Fuel Pumps.  As demonstrated above in Section III, ¶¶ 58-95, older model year versions of the Recalled Vehicles exhibit the Fuel Pump Defect, as well as other Subaru models which are equipped with the Fuel Pump as the 2013-2019 Subaru Forester.

153.    Omission of these additional Class Vehicles from the Recall is improper, as Subaru had ample knowledge the unreasonably dangerous Fuel Pump Defect exists within these vehicles.

154.    Notably, Class Vehicles not included in the Recall will not benefit from any remedy Subaru develops to address the Fuel Pump Defect.

155.    Second, despite knowing of the Fuel Pump Defect and issuing the Recall, Subaru has not notified the owners affected by the Fuel Pump Defect.  Subaru stated it will notify owners of the Recalled Vehicles on June 5, 2020—nearly two months after it admitted the Fuel Pump Defect.  Thus, while Subaru knows the Fuel Pump Defect can result in collision and serious injury or death, Subaru's voluntary business strategy is to remain silent and keep consumers in the dark about the dangerous defect until months after it acknowledged it to NHTSA.  And even when Subaru does notify owners of the Recalled Vehicles, Class members excluded from the Recall will not be notified.

156.    Third, Subaru does not identify a date when the remedy will be available, if ever.  Specifically, though Subaru states it will replace the Fuel Pump with an improved one, in the Subarunet Announcement (the "Announcement")[68] accompanied with the Recall Report, Subaru states the parts are not yet available for the repair.  This means Subaru is allowing undeniably dangerous Class Vehicles to

---

[68] The Announcement is attached hereto as Exhibit B.

be driven by its customers throughout the United States, including Alabama.  It also means there is no guarantee that the corrective remedy will be effective.

157.    Finally, despite knowing of the unreasonably dangerous propensity for a crash caused by the Fuel Pump Defect, Subaru has not indicated it intends to take the Class Vehicles off the road—even if temporarily.  Subaru has not warned Class members to quit driving their vehicles or provided them with a free loaner of comparable make, model, and value until their Class Vehicle is repaired.  Thus, Subaru is knowingly keeping Class members in danger.

158.    Therefore, the Recall is inadequate and unconscionable.  It fails to promptly alert Class members to the admittedly dangerous Fuel Pump Defect and provide them with a safe alternative, which inevitably will lead to more Fuel Pump failures, and possibly injury or death. The Recall is also inadequate in scope, omitting other models equipped with the same defective Fuel Pump.  Moreover, there is no indication the repair will be executed anytime soon or whether it will be effective.  These actions are deceitful, unconscionable, and expose Class members to injury and death. In addition to these dangers, Subaru's actions have deprived purchasers and lessees of the Class Vehicles of the benefit of their bargain.

## VII.  APPLICABLE WARRANTIES

159.    Subaru sold and leased the Class Vehicles with written express warranties.

160.    Subaru offered a written express basic warranty covering Subaru brand vehicles for 36 months or 36,000 miles covering all components (except normal wear and tear).  Subaru also offered a five year or 60,000 mile powertrain warranty.

161.    Subaru provides these warranties to buyers and lessees after the purchase/lease of the Class Vehicles is completed; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.

162.    Class members complain to dealers about the Fuel Pump Defect but do not receive an adequate repair, breaching the express and implied warranties provided by Subaru.

## VIII.  FRAUDULENT OMISSION/CONCEALMENT ALLEGATIONS

163.    Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Subaru and Denso responsible for making false and misleading statements regarding the Class Vehicles. Subaru and Denso necessarily are in possession of all of this information. Plaintiffs' claims arise out of Defendants' fraudulent omission/concealment of the Fuel Pump Defect, despite their representations about the quality, safety, and comfort of the Class Vehicles.

164.    Plaintiffs allege that at all relevant times, including specifically at the time they and Class members purchased their Class Vehicle, Defendants knew, or were reckless in not knowing, of the Fuel Pump Defect; Defendants had a duty to

disclose the Fuel Pump Defect based upon their exclusive knowledge; and Defendants never disclosed the Fuel Pump Defect to Plaintiffs or the public at any time or place in any manner other than a halfhearted, inadequate recall of a subset of the Class Vehicles.

165.    Plaintiffs make the following specific concealment/omission-based allegations with as much specificity as possible absent access to the information necessarily available only to Defendants:

    a.    **Who**: Defendants actively concealed and omitted the Fuel Pump Defect from Plaintiffs and Class members while simultaneously touting the safety and dependability of the Class Vehicles, as alleged herein. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Defendants responsible for such decisions.

    b.    **What**: Defendants knew, or were reckless or negligent in not knowing, that the Class Vehicles contain the Fuel Pump Defect, as alleged herein. Defendants concealed and omitted the Fuel Pump Defect while making representations about the safety, dependability, and other attributes of the Class Vehicles, as alleged herein.

    c.    **When**: Defendants concealed and omitted material information regarding the Fuel Pump Defect at all times while making representations about the safety and dependability of the Class Vehicles on an ongoing basis,

and continuing to this day, as alleged herein. Defendants still have not disclosed the truth about the full scope of the Fuel Pump Defect in the Class Vehicles to anyone outside of their respective entities. Defendants have never taken any action to inform consumers about the true nature of the Fuel Pump Defect in Class Vehicles. And when consumers brought their vehicles to Subaru complaining of the Fuel Pump failures, Subaru denied any knowledge of or repair for the Fuel Pump Defect.

d.     **Where**:  Defendants concealed and omitted material information regarding the true nature of the Fuel Pump Defect in every communication they had with Plaintiffs and Class members and made representations about the quality, safety, and comfort of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing, in which Defendants disclosed the truth about the full scope of the Fuel Pump Defect in the Class Vehicles to anyone outside of their respective entities. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Defendants' websites.  There are channels through which Defendants could have disclosed the Fuel Pump Defect, including but not limited to, (1) point of sale communications; (2) the owner's manual; and/or (3) direct communication to Class members through means such as state vehicle registry lists.

e.  **How**:  Defendants concealed and omitted the Fuel Pump Defect from Plaintiffs and Class members and made representations about the quality, safety, dependability, and comfort of the Class Vehicles. Defendants actively concealed and omitted the truth about the existence, scope, and nature of the Fuel Pump Defect from Plaintiffs and Class members at all times, even though it knew about the Fuel Pump Defect and knew that information about the Fuel Pump Defect would be important to a reasonable consumer, and Subaru promised in its marketing materials that Class Vehicles have qualities that they do not have.

f.  **Why**:  Defendants actively concealed and omitted material information about the Fuel Pump Defect in the Class Vehicles for the purpose of inducing Plaintiffs and Class members to purchase and/or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles, and made representations about the quality, safety, durability, and comfort of the Class Vehicles. Had Defendants disclosed the truth, for example in its advertisements or other materials or communications, Plaintiffs and Class members (all reasonable consumers) would have been aware of it, and would not have bought or leased the Class Vehicles or would not have paid as much for them.

## IX.  TOLLING OF THE STATUE OF LIMITATIONS

## A. Continuing Act Tolling

166.    Beginning in 2013, Subaru continuously marketed and sold Class Vehicles to unsuspecting customers.  It continuously represented the Class Vehicles as safe and dependable despite their propensity to lose fuel pressure, hesitate under acceleration and/or experience engine shutdown.  By making these false representations, and failing to disclose the existence of the Fuel Pump Defect in the Class Vehicles and thereby exposing occupants to risk of injury and death, Subaru engaged in a continuing wrong sufficient to render inapplicable any statute of limitations that Subaru might seek to apply.

167.    Pursuant to the TREAD Act, 49 U.S.C. § 30118, manufacturers are required to report information regarding customer complaints and warranty claims to NHTSA, and federal law imposes criminal penalties against manufacturers who fail to disclose known safety defects. Subaru owed a continuing duty to Plaintiffs and Class members to disclose to any risks to life and limb that its products pose.  It continually breached that duty.

168.    Subaru breached its duties to consumers by knowingly selling Class Vehicles with the defective Fuel Pumps on an ongoing basis.

169.    Subaru's knowledge of the Fuel Pump Defect is evidenced by numerous NHTSA complaints by consumers, many of whom reported contacting Subaru directly about the Defective Fuel Pump.  Other NHTSA complainants

reported taking their vehicles to Subaru's dealers, who are agents of Subaru and, on information and belief, report consumer complaints back to Subaru.

170.    Thus, Subaru had continuing knowledge of the Fuel Pump Defect and the dangers it posed, yet continued to market, sell and lease the Class Vehicles. plaintiffs'' and other Class members' claims are not time barred.

**B.    Fraudulent Concealment Tolling**

171.    Subaru had a duty to disclose to Plaintiffs and the Class members the true quality and nature of the Class Vehicles, that the Class Vehicles had uniform defect; and that the Fuel Pump Defect requires repairs, poses a safety risk, and reduces the intrinsic and resale value of the affected vehicles.

172.    This duty arose, inter alia, under the TREAD Act, 49 U.S.C. § 30118.

173.    Subaru knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Fuel Pump Defect, as alleged herein. Subaru concealed and omitted the Fuel Pump Defect while making representations about the safety, dependability, and other attributes of the Class Vehicles, as alleged herein.

174.    Despite its knowledge of the Fuel Pump Defect, Subaru failed to disclose and concealed this material information from Plaintiffs and other Class members, and instead continued to market the Class Vehicles as safe and durable.

175.    The purpose of Subaru's concealment of the Defective Fuel Pump was to prevent Plaintiffs and other Class members from seeking redress.

176.    Plaintiffs and the other Class members justifiably relied on Subaru to disclose the existence of dangerous defects, including the Fuel Pump Defect, in the Class Vehicles that they purchased or leased, because that defect was not discoverable by Plaintiffs and the other Class members through reasonable efforts.

177.    Any applicable statute of limitations has been tolled by Subaru's knowledge, active concealment, and denial of the facts alleged herein, which behavior was ongoing.

**C.    Discovery Rule Tolling**

178.    Even through the exercise of reasonable diligence, plaintiffs and other Class members could not have discovered, prior to Subaru's issuance of the Recall Report on January 13, 2020 and/or the Second Recall Report on March 4, 2020, that Subaru was concealing and misrepresenting the existence of a dangerous defect, the Fuel Pump Defect, in the Class Vehicles and the risks it posed.

179.    Plaintiffs and the other Class members could not have reasonably discovered, and could not have known of facts that would have caused a reasonable person to suspect, that Subaru failed to disclose material information within its knowledge about a dangerous defect to consumers worldwide.

## X.    CLASS ACTION ALLEGATIONS

180.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

181.    Plaintiffs seek to represent an Alabama statewide class (the "Alabama Class") defined as follows:

> All current and forms owners and lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Alabama.

182.    Plaintiffs also seeks to represent a class ("Nationwide Class") defined as:

> All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the fifty States, the District of Columbia, Puerto Rico, and all other United States territories and/or possessions.

183.    Excluded from the Alabama Class ("Statewide Class") and Nationwide Class (together, "Classes") are Subaru and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case. Plaintiffs reserve the right to modify or amend definitions of the Classes, and to add additional classes and sub-classes, as appropriate, during the course of this litigation.

184.    This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

185.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**    The members of the Classes are so numerous and geographically dispersed that individual joinder of all class members is impracticable.  While Plaintiffs is informed and believes that there are not less than at least approximately 200,000 members of the Classes, the precise number of Class Vehicles is unknown to Plaintiffs, but may be ascertained from Subaru's books and records.  Nationwide and Statewide Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

186.    **Commonality and Predominance – Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).**    This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation:

a.    whether Defendants engaged in the conduct alleged herein;

b.    whether Defendants' alleged conduct violates applicable law;

c.    whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

d.    whether Defendants made false or misleading statements about the quality and safety of the Class Vehicles;

e.       whether the Class Vehicles contain the Fuel Pump Defect;

f.       whether Defendants had actual or implied knowledge about the alleged defect but failed to disclose it to Plaintiffs and the other members of the Classes;

g.       whether Defendants' omissions and concealment regarding the quality of the Class Vehicles were likely to deceive the Statewide Class members in violation of the state consumer protection statutes alleged herein;

h.       whether Subaru breached its express warranties with respect to the Class Vehicles;

i.       whether Subaru breached its implied warranties with respect to the Class Vehicles;

j.       whether the members of the Classes overpaid for their Class Vehicles as a result of the defect alleged herein;

k.       whether the members of the Classes are entitled to damages, restitution, disgorgement, statutory damages, exemplary damages, equitable relief, and/or other relief; and

l.       the amount and nature of relief to be awarded to Plaintiffs and the other members of the Classes.

187.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the claims of the other members of the Classes because Plaintiffs and the members of the Classes purchased or leased Class Vehicles that

contain defective Fuel Pumps, as described herein.  Neither Plaintiffs nor the other members of the Classes would have purchased the Class Vehicles, or would have as much as they did for the Class Vehicles, had they known of the Fuel Pump Defect. Plaintiffs and the other members of the Classes suffered damages as a direct proximate result of the same wrongful practices in which Defendants engaged. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other members of the Classes.

188.   **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes that they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including automotive litigation, and Plaintiffs intend to prosecute this action vigorously.  The interests of the members of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

189.   **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**  Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Nationwide and Statewide Class members as a whole.

190.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).**    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the others members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the other members of the Classes to individually seek redress for Defendants' wrongful conduct.  Even if these Class members could afford individual litigation, the court system could not. Individual litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device, as intended by Congress, presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## XI.    CLAIMS FOR RELIEF

### COUNT 1
### VIOLATIONS OF ALABAMA'S DECEPTIVE TRAE PRACTICES ACT
### ALA. CODE §§ 8-19-1 ET SEQ.
(Individually and on behalf of the Statewide Class)
(As to all Defendants)

191.    Plaintiffs Griffin, Oakley and Whitley ("Plaintiffs" for purposes of this Count) incorporate by reference each allegation as if fully set forth herein.

- 73 -

192.    Plaintiffs bring this claim individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

193.    The Alabama Deceptive Trade Practices Act, Ala. Code. § 8-19-5, prohibits "[e]ngaging in . . . unconscionable, false, or deceptive act[s] or practice[s] in business, commerce, or trade."

194.    By the conduct described in detail above and incorporated herein, Defendants engaged in deceptive trade practices.

195.    Defendants' omissions regarding the Fuel Pump Defect, described above, which causes the Fuel Pump to prematurely fail, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

196.    Defendants intended for Plaintiffs and the other Class members to rely on the omissions regarding the Fuel Pump Defect.

197.    Plaintiffs and the other Class members justifiably acted or relied to their detriment upon Defendants' omissions of fact concerning the above-described Fuel Pump Defect, as evidenced by Plaintiffs and the other Class members' purchases of Class Vehicles.

198.    Had Defendants disclosed all material information regarding the Fuel Pump Defect to Plaintiffs and the other Class members, Plaintiffs and the other Class

members would not have purchased or leased Class Vehicles or would have paid less to do so.

199.    Defendants' omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

200.    Subaru was provided notice pursuant to a notice letter sent on behalf of Plaintiffs and the Classes sent via certified mail on April 23, 2020.  Subaru was also notified of the Fuel Pump Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge. Subaru has not remedied its breach.

201.    Further, Subaru has refused to provide an adequate and timely warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile.  Customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repairs.

202.    As a direct and proximate result of Defendants' deceptive trade practices, Plaintiffs and the other Class members have suffered ascertainable loss and actual damages. Plaintiffs and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Fuel Pump Defect been disclosed. Plaintiffs and the other Class members also suffered diminished

value of their vehicles. Plaintiffs and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under Ala. Code. §§ 8-19-1, et seq.

## COUNT 2
### Strict Product Liability: Design Defect
(Individually and on behalf of the Alabama Class)
(As to all Defendants)

203.    Plaintiffs Griffin, Oakley, and Whitley ("Plaintiffs" for purposes of this Count) incorporate by reference each allegation as if fully set forth herein.

204.    Plaintiffs bring this claim individually and on behalf of other members of the Alabama Class (the "Class," for purposes of this Count).

205.    Defendants are strictly liable for designing, engineering, testing, validating, manufacturing, and placing in the stream of commerce an unreasonably dangerous Fuel Pump.

206.    Defendants designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the unreasonable dangerous Fuel Pump.

207.    The Class Vehicles and Fuel Pumps are being used in an intended and/or foreseeable manner.  Plaintiffs and Class members have not misused or materially altered the Class Vehicles or Fuel Pumps.  The Class Vehicles and Fuel Pumps are in the same or substantially similar condition as they were at the time of purchase/lease.

208.    The Class Vehicles and Fuel Pumps are unreasonably dangerous and defective because they were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce with the Fuel Pump Defect that can cause Class Vehicles to suddenly and unexpectedly stall or lose engine power.

209.    The Fuel Pump Defect causes an unreasonably dangerous condition when Class Vehicles are used for their intended and foreseeable purpose of providing safe and reliable transportation and places Plaintiffs, Class members, and others on the road at an unreasonable and substantial risk for injury or death.

210.    Defendants were aware of feasible alternative designs which would minimize or eliminate the Fuel Pump Defect and the risk it poses.  Such alternative designs were known and available when the Class Vehicles and Fuel Pumps were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce.

211.    Defendants failed to design, test, validate, manufacture, and place in the stream of commerce a Class Vehicle and Fuel Pump that is free from the Fuel Pump Defect and the unreasonable safety risks it poses.

212.    As a result of Defendants' actions as described herein, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

**COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**ALA. CODE §§ 7-2-313 AND 7-2A-210**
(Individually and on behalf of the Statewide Class)

(As to Subaru)

213.    Plaintiffs Griffin, Oakley, and Whitely ("Plaintiffs" for purposes of this Count) incorporate by reference each allegation as if fully set forth herein.

214.    Plaintiffs bring this claim individually and on behalf of the other members of the Alabama Class (the "Class" for purposes of this Count).

215.    Subaru is a merchant with respect to the Class Vehicles.

216.    In its written express warranties, Subaru expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

217.    Subaru's written express warranties formed the basis of the bargain that was reached when Plaintiffs and the other Class members purchased or leased their Class Vehicles.

218.    Subaru breached its express warranty to repair defective parts in the Class Vehicles. Subaru admittedly has not repaired the Class Vehicles' Fuel Pump Defect.

219.    Subaru was provided notice pursuant to a notice letter sent on behalf of Plaintiffs and the Classes sent via certified mail on April 23, 2020.  Subaru was also provided notice of the Fuel Pump Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge. Subaru has not remedied its breach.

220.    Further, Subaru has refused to provide an adequate and timely warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile.  Customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repairs.

221.    The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because Subaru has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

222.    Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited remedy of repair, and Plaintiffs, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

223.    Also, as alleged in more detail herein, at the time that Subaru warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Subaru improperly concealed material facts regarding its Class Vehicles. Plaintiffs and the other Class members were therefore induced to purchase or lease the Subaru Vehicles under false pretenses.

224.    As a direct and proximate result of Subaru's breach of its express warranty, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

**COUNT 4**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**ALA. CODE §§ 7-2-314 AND 7-2A-314**
(Individually and on behalf of the Statewide Class)
(As to Subaru)

225.    Plaintiffs Griffin, Oakley, and Whitley ("Plaintiffs" for purposes of this Count) incorporate by reference each allegation as if fully set forth herein.

226.    Plaintiffs bring this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

227.    Subaru is a merchant with respect to motor vehicles under Ala. Code § § 7-2-104 and 7-2A-103.

228.    Pursuant to Ala. Code §§ 7-2-314 and 7-2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

229.    The Class Vehicles do not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the Fuel Pump Defect which causes the Class Vehicles' Fuel Pump to prematurely fail.

230.    Subaru was provided notice pursuant to a notice letter sent on behalf of Plaintiffs and the Classes sent via certified mail on April 23, 2020.  Subaru was also

provided notice of the Fuel Pump Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge. Subaru has not remedied its breach.

231.    Further, Subaru has refused to provide an adequate and timely warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repair.

232.    Plaintiffs and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Subaru's breach of the warranty of merchantability.

233.    As a direct and proximate result of Subaru's breach of the warranty of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT 5**
**Negligent Recall/Undertaking**
(Individually and on behalf of the Statewide Class)
(As to Subaru)

234.    Plaintiffs Griffin, Oakley, and Whitley ("Plaintiffs" for purposes of this Count) incorporate by reference each allegation as if fully set forth herein.

235.    Plaintiffs bring this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

236.    Prior to the events made the basis of this action, Subaru designed, engineered, manufactured, marketed, and placed the Class Vehicles in the stream of commerce.

237.    On April 16, 2020, Subaru initiated a voluntary recall of the Recalled Vehicles.  Subaru's recall was voluntary and not initiated by NHTSA.

238.    Subaru owed a duty to use reasonable care to Plaintiffs and Class members based on its undertaking of the Recall.

239.    As described above, Subaru breached its duty by conducting the Recall negligently and/or wantonly by, among other things, failing to notify Plaintiffs and the Class of the Fuel Pump Defect, failing to direct Class members to stop driving their Class Vehicles, and failing to offer Class members a free loaner vehicles of comparable make, model, or value as their Class Vehicles until Subaru is able to devise a repair that works (if ever) and implement it in each Class Vehicle.  Subaru's failure to do so continues to expose Plaintiffs and the Class to the risk of injury and death.

240.    For the reasons set for the above, Subaru knew, or should have known through the exercise of ordinary care, the Recall was not being performed in a reasonable manner.

241.    As a direct and proximate result, Plaintiffs and the other Class members have been and continue to be damaged in an amount to be determine at trial.

**COUNT 6**
**FRAUDULENT OMISSION**
(Individually and on behalf of the Statewide Class)
(As to all Defendants)

242.    Plaintiffs Griffin, Oakley, and Whitley ("Plaintiffs" for purposes of this Count) incorporate by reference each allegation as if fully set forth herein.

243.    Plaintiffs bring this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

244.    Defendants were aware of the Fuel Pump Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiffs and the other members of the Class.

245.    Having been aware of the Fuel Pump Defect within the Class Vehicles, and having known that Plaintiffs and the other members of the Class could not have reasonably been expected to know of the Fuel Pump Defect, Defendants had a duty to disclose the defect to Plaintiffs and the other members of the Class in connection with the sale or lease of the Class Vehicles.

246.    Defendants did not disclose the Fuel Pump Defect to Plaintiffs and the other members of the Class in connection with the sale of the Class Vehicles.

247.    For the reasons set forth above, the Fuel Pump Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

248.    In purchasing the Class Vehicles, Plaintiffs and the other members of the Class reasonably relied on Defendants to disclose known material defects with respect to the Class Vehicles.

249.    Had Plaintiffs and the other members of the Class known of the Fuel Pump Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

250.    Through its omissions regarding the Fuel Pump Defect within the Class Vehicles, Defendants intended to induce, and did induce, Plaintiffs and the other members of the Class to purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

251.    As a direct and proximate result of Defendants' omissions, Plaintiffs and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Fuel Pump Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT 7
## ENJUST ENRICHMENT
(Individually and on behalf of the Statewide Class)
(As to all Defendants)

252.    Plaintiffs Griffin, Oakley, and Whitley ("Plaintiffs" for purposes of this Count) incorporate by reference each allegation as if fully set forth herein.

253.    Plaintiffs bring this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

254.    Defendants have benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Defendants' concealment of the Fuel Pump Defect, and Plaintiffs and the other members of the Class have overpaid for these vehicles.

255.    Defendants have received and retained unjust benefits from Plaintiffs and the other members of the Class, and inequity has resulted.

256.    It is inequitable and unconscionable for Defendants to retain these benefits.

257.    Because Defendants concealed its fraud and deception, Plaintiffs and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Defendants' misconduct.

258.    Defendants knowingly accepted the unjust benefits of its wrongful conduct.

259.    As a result of Defendants' misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and the other members of the Class in an amount to be proven at trial.

## COUNT 8
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
## 15 U.S.C. §§ 2301 *et seq.*
(Individually and on behalf of the Nationwide Class)

(As to Subaru)

260.   Plaintiffs Katherine Griffin, Janet Oakley, and Adam Whitley ("Plaintiffs "for purposes of this Count) incorporate by reference each allegation as if fully set forth herein.

261.   Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count).

262.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332 (a) and (d).

263.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

264.   Subaru is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4)-(5).

265.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

266.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

267.   In its express written warranties, Subaru expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects become apparent during the warranty period.

268.   Subaru's warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C.  § 2301(7).

269.   With respect to Class members' purchases or leases of the Class Vehicles, the terms of Subaru's written warranties and implied warranty became part of the basis of the bargain between Subaru and Plaintiffs and other Class members.

270.   Subaru breached the implied warranty of merchantability.  Without limitation, the Class Vehicles have Fuel Pumps that prematurely fail, as described above, which renders the Class Vehicles unmerchantable.

271.   Subaru breached its express warranties by not offering a functioning repair for the defective Fuel Pump in the Class Vehicles as evidenced by Subaru's own admission in the Recall Report that it has not identified a remedy.

272.   Further, Subaru has refused to provide an adequate and timely warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile.  As stated above, Class members report Fuel Pump failure to their dealer, but Subaru has failed to repair the defect.

273.   At the time of sale or lease of each Class Vehicle, Subaru knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Fuel Pump Defect.

274.    The amount in controversy of Plaintiffs' individual claims exceed the sum of $25.  The amount in controversy in this action exceeds the sum of $50,000, exclusive of costs and interest, computed on the basis of all claims to be determined in this lawsuit.

275.    Plaintiffs, individually and on behalf of the Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

## XII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief against Defendants as set forth below:

1.    Certifying the proposed Nationwide and Statewide Classes;

2.    Appointing Plaintiffs as the Class representatives and Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. as Class counsel;

3.    Ordering Defendants to pay actual and statutory damages (including punitive damages) and restitution to Plaintiffs and the other Class members, as allowable by law;

4.    Enjoining Defendants from continuing the unfair business practices alleged in this Complaint;

5.    Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded;

6.      Ordering Defendants to pay attorneys' fees and costs of suit;

7.      Awarding injunctive relief requiring Subaru promptly and fully inform Class members of the Fuel Pump Defect and its associated dangers and instructing such Class members to cease driving their vehicles, and ordering Subaru provide free loaner vehicles of comparable make, model, or value to the Class Vehicle each Class member owns or leases until a remedy for the Fuel Pump Defect is installed in the Class Vehicles; and

8.      Granting such additional relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a jury trial on all issues so triable.


Dated:        April 23, 2020                  /s/ W. Daniel "Dee" Miles, III
                                              W. Daniel "Dee" Miles, III (ASB-7656-
                                                  M75W)
                                              Demet Basar*
                                              H. Clay Barnett, II* (ASB-4878-N68B)
                                              J. Mitch Williams* (ASB-8560-X19D)
                                              **BEASLEY, ALLEN, CROW,**
                                              **METHVIN, PORTIS & MILES, P.C.**
                                              272 Commerce Street
                                              Montgomery, Alabama 36104
                                              Telephone: 334-269-2343
                                              Dee.Miles@Beasleyallen.com
                                              Demet.Basar@BeasleyAllen.com
                                              Clay.Barnett@BeasleyAllen.com
                                              Mitch.williams@Beasleyallen.com

                                              *Pro vac vice forthcoming*

                                              *Counsel for Plaintiffs*

- 89 -